T.C. Memo. 2004-179


UNITED STATES TAX COURT


RAGNHILD A. WESTBY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 23041-96, 23054-96.    Filed August 3, 2004.


Ragnhild A. Westby, pro se.

<u>John C. Schmittdiel</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  In notices of deficiency dated July 29, 1996, respondent determined the following deficiencies, additions to tax, and penalties with respect to petitioner's Federal income taxes:

Docket No. 23041-96

| Year | Deficiency | Additions to tax Delinquency Sec. 6651(a)(1)[1] | Negligence Sec. 6653(a)(1) | Accuracy-related penalty Sec. 6662(a) |
|------|-----------|--------------------------|------------------------|---------------------|
| 1988 | $59,032 | [1]$14,758 | $3,210 | -- |
| 1989 | 72,150 | [1]18,038 | -- | $14,430 |
| 1990 | 83,595 | [1]20,899 | -- | 16,719 |

[1]Respondent determined that petitioner was liable for the addition to tax under sec. 6651(a)(1) for each of the years 1988-90 in an amended answer. Respondent, therefore, bears the burden of proof with respect to the imposition of the sec. 6651(a) addition to tax for those years. Rule 142(a).

Docket No. 23054-96

| Year | Deficiency | Delinquency Sec. 6651(a)(1) | Negligence Sec. 6653(a)(1) |
|------|-----------|------------------------|------------------------|
| 1987 | $55,459 | $13,865 | [1]$2,773 |

[1]For 1987, in addition to imposing the 5-percent negligence addition to tax under sec. 6653(a)(1)(A), respondent also imposed an addition to tax equal to 50 percent of the interest due on the tax deficiency of $55,459. See sec. 6653(a)(1)(B).

Petitioner timely filed petitions seeking a redetermination of respondent's adjustments for 1987-90. We consolidated the resulting cases for purposes of trial, briefing, and opinion,

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts have been rounded to the nearest dollar.

pursuant to Rule 141(a),[2] and shall refer to the consolidated

cases in the singular in this opinion.

The issues for decision are:

(1)  Whether, and to what extent, petitioner failed to

report income from her law practice for the years at issue;

(2)  whether, and to what extent, petitioner is entitled to

business expense deductions claimed with respect to her law

practice for the years at issue;

(3)  whether, and to what extent, petitioner is entitled to

net operating loss carryforward deductions claimed for the years

at issue; and

(4)  whether petitioner is liable for the addition to tax

for negligence under section 6653(a)(1) (for 1987 and 1988), the

---

[2]For 1988, the notice of deficiency denies a deduction for
$4,028 of "Rowe Rent Expenses", and, for 1989, it lists "Rowe
Unreported Income" of $4,200 (the Rowe adjustments).  Those
amounts are included in respondent's computation of tax
deficiencies for 1988 and 1989, as set forth in the notice of
deficiency for those years.  Thomas G. Rowe (Rowe), with whom
petitioner filed joint returns for 1988 through 1990, and
respondent entered into a separate settlement of Rowe's joint and
several tax liabilities for 1988-90.  Consequently, Rowe is not a
party to this litigation.  Respondent states that the Rowe
adjustments are not at issue in this case.  It is not clear,
however, on what basis respondent relies in making this
statement.  Although petitioner stated during the trial that she
is not claiming that she is an "innocent spouse", there is no
indication in the record that petitioner knew about, or intended
to waive, her right to request relief under sec. 6015 regarding
the Rowe adjustments.  Consequently, if respondent intends to
hold petitioner liable for the Rowe adjustments, we shall give
petitioner the opportunity to file a request for relief under
sec. 6015 before we enter a decision in this matter.

accuracy-related penalty under section 6662(a) and (b)(1) (for 1989 and 1990), and/or the delinquency addition to tax under section 6651(a)(1) (for each of the years at issue).[3]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the first supplemental stipulation of facts are incorporated herein by this reference.

When the petitions in this case were filed, petitioner resided in St. Paul, Minnesota. Petitioner was married to Thomas G. Rowe (Rowe) during the years at issue, but she and Rowe filed joint returns only for 1988-90. Petitioner's filing status for 1987 was married filing separate.

I. Petitioner's Reporting of Income and Expenses From Her Law Practice (Schedule C)

During the years at issue, and for a number of earlier years, petitioner maintained a sole proprietorship family law practice, although she regularly retained other attorneys to provide services in connection with certain of her cases. Each of the Federal income tax returns filed by petitioner (1987) and by petitioner and Rowe jointly (1988-90), included a Schedule C, Profit or (Loss) From Business or Profession (Sole

---

[3]Respondent also made adjustments to petitioner's Schedule A, Itemized Deductions, and recomputed petitioner's self-employment tax for each of the years at issue. Those adjustments are derivative of the Schedule C, Profit or (Loss) From Business or Profession (Sole Proprietorship), adjustments and will be resolved by our resolution of the latter.

Proprietorship), reporting the income, expenses, and profit or loss from petitioner's law practice. Petitioner's Schedules C listed gross income, deductions, and net profit (loss) in the following amounts:

| Year | Gross income | Deductions | Net profit (loss) |
|------|--------------|------------|-------------------|
| 1987 | $75,097 | $76,198 | $(1,101) |
| 1988 | 128,896 | 121,459 | 7,437 |
| 1989 | 124,463 | 115,690 | 8,773 |
| 1990 | 95,730 | 124,543 | (28,813) |

II.  Respondent's Adjustments to Petitioner's Schedule C Income and Deductions in the Notices of Deficiency

A.  Adjustments to Income

Respondent increased petitioner's Schedule C gross income[4] for the years in issue in the following amounts:

| Year | Adjustment |
|------|------------|
| 1987 | $77,811 |
| 1988 | 117,819 |
| 1989 | 116,483 |
| 1990 | 154,069 |

Respondent based the adjustments to petitioner's Schedule C gross income on two personal financial statements that petitioner submitted to American National Bank (ANB) in St. Paul (the financial statements). Petitioner submitted the first financial statement, dated December 22, 1987 (the 1987 financial statement), in connection with her purchase of a home and the

---

[4]Petitioner's gross income equaled her gross receipts in each of the years at issue because she was a cash basis taxpayer and had no cost of goods sold during those years.

second financial statement, dated August 8, 1989 (the 1989 financial statement), in connection with a refinancing. The financial statements listed "Employment Income" of $77,811 and $125,256 for 1987 and 1989, respectively. The "Employment Income" shown on each financial statement represented petitioner's estimate of the gross income, unreduced by any expenses, generated by her law practice as of the date of the financial statement.[5]

In his notice of deficiency for 1987, respondent determined that petitioner had unreported Schedule C income of $77,811, equal to the amount of "Employment Income" listed in the 1987 financial statement. Respondent calculated the adjustment to petitioner's Schedule C income for 1987 by treating the "Employment Income" shown on the 1987 financial statement as additional unreported income from petitioner's law practice. Respondent did not reduce the income adjustment to take into account petitioner's reported Schedule C gross income of $75,097.

In his notice of deficiency for 1988-90, respondent determined that petitioner had unreported Schedule C income for each year based upon the $125,256 listed as "Employment Income" in the 1989 financial statement. For 1988, respondent determined

---

[5]Petitioner explained the entries to ANB, the financial institution to which she submitted the financial statements, and to the revenue agent who was assigned to conduct the examination of her returns for the years at issue.

the unreported income adjustment of $117,819 by subtracting petitioner's reported Schedule C net profit of $7,437 for 1988 from the "Employment Income" of $125,256 shown on the 1989 financial statement.  For 1989, respondent determined the unreported income adjustment of $116,483 by subtracting petitioner's reported Schedule C net profit of $8,773 from $125,256.  For 1990, respondent determined the unreported income adjustment of $154,069 by adding petitioner's reported Schedule C net loss of $28,813 to $125,256.

B.  Disallowance of Petitioner's Schedule C Deductions

For 1988, respondent disallowed $59,038 of petitioner's total Schedule C deductions of $121,459, but the notice of deficiency does not indicate which Schedule C deductions were disallowed.  For 1987, 1989, and 1990, respondent disallowed all of petitioner's Schedule C deductions.  The sole basis for respondent's disallowance of petitioner's Schedule C expenses for each of the years at issue set forth in the notices of deficiency was:  "Since you did not establish that the business expense shown on your tax return was paid or incurred during the taxable year and that the expense was ordinary and necessary to your business, we have disallowed the amount shown."

III.  Description of Petitioner's Business Records

Petitioner, a cash basis taxpayer, did not maintain formal journals and ledgers with respect to her law practice or record

the results of her law practice using a formal bookkeeping system. Instead, petitioner entered business receipts (client payments) in handwritten ledger books. On occasion, petitioner also entered nonbusiness receipts (receipts other than client payments) in the ledger books. Petitioner also retained deposit slips reflecting the deposit of client payments into various bank accounts.

In support of her Schedule C deductions, petitioner retained canceled checks and other bank records, cash receipts, invoices, credit card statements, credit card receipts, and other pertinent documents. Petitioner's practice was to make a notation (e.g., the client's name) on a canceled check that would explain the purpose of the check. Thus, later she would be able to determine whether it represented a deductible expense of her law practice. Petitioner numerically coded certain of the canceled checks and many of her business-related cash and credit card receipts and statements. Each number represented a specific type of expense (e.g., 1 for client entertainment, 5 for office expenses, etc.). Petitioner divided the checks and cash receipts by type or category of expense, placed them in separate envelopes, and submitted the envelopes to her husband's accountant, John R. Aunan (Mr. Aunan), for his use in preparing the tax returns for the years at issue.

During the years at issue, petitioner maintained banking relationships with at least two financial institutions--ANB at which petitioner maintained two checking accounts (Nos. 302-733-1 and 109-070-3), a payroll account (No. 109-139-6), and several personal and commercial loan accounts; and First Bank at which she maintained a checking account (No. 2624676067).[6]

IV. Respondent's Review of Petitioner's Business Records

Although petitioner produced her business records (ledger books, checks, cash receipts, credit card receipts, credit card statements, and other documents) to the revenue agent in connection with the examination of her returns for 1987-90, the revenue agent failed to examine and/or utilize petitioner's records for 1987, 1989, and 1990 to ascertain the accuracy of the income and expenses claimed on petitioner's Schedules C for those years. With the possible exception of 1988, for which a portion of petitioner's Schedule C deductions was allowed, respondent issued the notices of deficiency without examining petitioner's business records.

A. Schedule C Income

Sometime after respondent issued the notices of deficiency, respondent undertook to reconstruct petitioner's Schedule C

------

[6]The record does not disclose when the accounts were opened and does not include complete records for the accounts. Petitioner also maintained other financial accounts during the years at issue, but the record contains minimal information concerning them.

income for the years at issue by analyzing petitioner's bank deposits during those years (the bank deposits analyses). The resulting bank deposits analyses, dated December 11, 1997, purport to list total monthly deposits, subtract "non-taxable deposits", and reduce the resulting adjustment by the amount of Schedule C gross income reported on petitioner's return for each of the years at issue. The bank deposits analyses developed proposed adjustments to petitioner's Schedule C income, enumerated below, that were dramatically lower than the proposed adjustments to petitioner's Schedule C income contained in the notices of deficiency:

|  | Proposed adjustment | |
| Year | Notice of deficiency | Deposit method |
| 1987 | $77,811 | $45,767 |
| 1988 | 117,819 | 7,113 |
| 1989 | 116,483 | 47,232 |
| 1990 | 154,069 | 13,785 |

Immediately before trial, the parties submitted a first supplemental stipulation of facts in which respondent conceded the 1988 and 1990 proposed adjustments for unreported income in their entirety,[7] revised the proposed 1987 and 1989 adjustments

---

[7]Respondent's counsel acknowledged at trial that concerns about a possible shift of the burden of proof to respondent "certainly came into play when we decided to concede" the 1988 and 1990 unreported income adjustments. In fact, respondent's counsel candidly explained the concessions as follows: "We felt that given the size of the discrepancy and the fact that, if the burden of proof were shifted, * * * we likely would not carry it."

consistent with the bank deposits analyses for those years, and, in addition, conceded $11,862 of the revised proposed adjustment for 1989. During the trial, respondent conceded $8,786 of the revised proposed adjustment for 1987.

As a result of respondent's bank deposits analyses and respondent's concessions, respondent's proposed adjustments for unreported Schedule C income that remain at issue are as follows:

| Year | Proposed adjustment |
|------|---------------------|
| 1987 | $36,981 |
| 1989 | 35,370 |

In preparing the bank deposits analysis for 1987, respondent did not obtain or review all of the relevant bank records with respect to petitioner's accounts and did not adequately adjust the analysis for nontaxable items. Most significantly, respondent did not analyze retained copies of petitioner's deposit slips and bank statements, did not obtain missing bank statements or copies of deposited items from the financial institutions with which petitioner maintained her bank accounts, and did not adjust the deposits analysis for all of the income sources reported on petitioner's 1987 return.

In preparing the bank deposits analysis for 1989, respondent attached a list of deposits made to one of the two accounts included in the analysis, on which some but not all of the deposit sources were listed. The deposits list apparently was prepared from retained copies of deposit tickets. Respondent did

not obtain or review copies of deposited items from all of the financial institutions with which petitioner maintained accounts during 1989.  In preparing the original 1989 bank deposits analysis, respondent failed to identify and subtract numerous nontaxable items and did not adjust the analysis for all of the income sources reported on petitioner's 1989 tax return.

    B.  Schedule C Deductions

    Petitioner deducted the following Schedule C expenses on her Federal income tax returns for the years at issue:

| Sch. C expense category | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|
| Advertising | $98 | $160 | $513 | $2,384 |
| Bank charges | 469 | 1,035 | 120 | 120 |
| Car & truck | 6,672 | 8,807 | 5,354 | 3,240 |
| Collection fees | -- | -- | 850 | -- |
| Deprec./sec. 179 | 2,546 | 11,974 | 2,444 | 1,467 |
| Dues & pubs. | 2,337 | 3,867 | 2,675 | 4,095 |
| Employee benefits | 2,057 | 2,243 | 5,274 | 3,998 |
| Insurance | 514 | 3,677 | 3,745 | 3,565 |
| Interest | 10,034 | 3,053 | 2,926 | 2,070 |
| Legal & prof. | 5,104 | 7,239 | 6,128 | 13,536 |
| Rent | 11,460 | 10,256 | 9,706 | 13,334 |
| Supplies | 4,174 | 12,297 | 13,139 | 7,263 |
| Taxes | 1,235 | 4,908 | 5,051 | 10,601 |
| Travel | 1,039 | -- | 1,601 | 1,988 |
| Meals & enter. | 896 | 1,961 | 795 | 3,286 |
| Utilities & telephone | 838 | 3,784 | 6,152 | 3,515 |
| Wages | 13,991 | 19,203 | 26,238 | 29,054 |
| Moving expense | 3,258 | -0- | -0- | -0- |
| Process services | 2,482 | 2,495 | 915 | 1,822 |
| Contract services | 4,637 | 10,618 | 9,617 | 10,079 |
| Court fees | 2,002 | 7,458 | 9,104 | 6,699 |
| Miscellaneous | 355 | 6,424 | 3,343 | 2,427 |
| Total Sch. C deductions | 76,198 | 121,459 | 115,690 | 124,543 |

Before the trial in this case commenced, petitioner again produced for review by respondent's employees, including a revenue agent and an Appeals officer, voluminous records in support of the Schedule C deductions claimed on her returns for the years at issue.  Respondent's review of petitioner's records resulted in the preparation of itemized lists of some of petitioner's canceled checks, credit card expenditures, and receipts.  The lists were revised on several occasions and admitted into evidence during trial.  The lists were prepared without any reference to the categorization of expenses claimed on petitioner's Schedules C for the years at issue because respondent claimed that he could not tell how petitioner's expenses were grouped for reporting purposes on petitioner's returns.

At the beginning of trial, respondent conceded that petitioner had deductible Schedule C expenses for the years at issue in the following amounts:

| Year | Amount | Exhibit No. |
|------|--------|-------------|
| 1987 | [1]$50,184.70 | 38-R |
| 1988 | 64,442.41 | 39-R |
| 1989 | 77,162.01 | 40-R |
| 1990 | 73,632.74 | 41-R |

[1]Respondent used a subtotal ($11,144.18) instead of the total ($12,034.71) from Sec. B of Ex. 38-R in calculating the amount of Schedule C expenses he conceded for 1987 ($49,294.17).

Following trial, respondent conceded additional Schedule C deductions for each of the years at issue as follows:

| Year | Additional expenses | Additional depreciation | Total additional deductions |
|------|------|------|------|
| 1987 | $10,785.18 | $741.28 | $11,526.46 |
| 1988 | 13,443.34 | 1,076.65 | 14,519.99 |
| 1989 | 8,944.60 | 1,076.65 | 10,021.25 |
| 1990 | 12,713.86 | 1,076.65 | 13,790.51 |

As a result of respondent's concessions regarding petitioner's deductible Schedule C expenses, the deduction amounts still in dispute are as follows:

| Year | Per return | Respondent's concessions | Amount in dispute |
|------|------|------|------|
| 1987 | $76,198 | $60,821 | $15,377 |
| 1988 | 121,459 | 78,962 | [1]42,497 |
| 1989 | 115,690 | 87,183 | 28,507 |
| 1990 | 124,543 | 87,423 | 37,120 |

[1]The Court's Oct. 17, 2000, order erroneously stated that, after giving effect to respondent's concessions, none of the deductions claimed on petitioner's 1988 Schedule C remained in dispute.

## V.  Return Preparation and Accountant Workpapers

Petitioner's income tax returns for the years at issue were prepared by Mr. Aunan.  Petitioner gave Mr. Aunan her canceled checks, cash and credit card receipts, and other documents, categorized in the manner described above.  Mr. Aunan prepared accounting workpapers based on his review of petitioner's records.  In so doing, Mr. Aunan grouped various categories of petitioner's Schedule C expenses into return preparation categories as reflected in his workpapers.[8]  Mr. Aunan's

[8]Throughout the trial in this case, however, respondent
(continued...)

workpapers include a schedule summarizing petitioner's documentation of her Schedule C income and expenses by category and by year. That schedule shows, for each of the years at issue, preliminary figures, adjusting entries, and final figures for each category of income and expense. The workpapers also include a summary schedule for the years at issue showing the income and expense information used by Mr. Aunan to prepare petitioner's Schedule C (including depreciation claimed), a workpaper entitled "Business Interest" that lists interest paid on petitioner's credit cards, a depreciation schedule that shows how Mr. Aunan calculated the depreciation claimed on petitioner's Schedules C, a workpaper entitled "Personal" that lists information regarding various Schedule A itemized deductions for each of the years at issue, a workpaper labeled "611 Dayton" relating to a rental property that petitioner owned and sold in 1987, and a Schedule C workpaper relating to the law practice of petitioner's husband.

---

[8](...continued)
maintained that he could not tell how Mr. Aunan had combined petitioner's expenses to arrive at the numbers reported on her income tax returns for the years at issue. Respondent's claimed inability to understand how petitioner's business expenses were categorized for return filing purposes led to the detailed listing of petitioner's expense records without regard to actual reporting of the expenses on the relevant tax returns.

VI.  Net Operating Losses

Petitioner and Rowe deducted net operating loss (NOL) carryforwards on their 1988-90 joint returns.  The NOL carryforwards were derived from losses claimed on Schedules C and Schedules E, Supplemental Income Schedule, of petitioner's 1980 and 1982 separate returns.  Petitioner's 1988-90 returns utilized the NOL carryforwards as follows:[9]

| Year | Schedule C income | Loss carryforward utilization |
|------|-------------------|-------------------------------|
| 1988 | $39,621 | $9,350 (1980 loss) |
| 1989 | 15,485 | 5,714 (1980 loss) |
|      |        | 9,771 (1982 loss) |
| 1990 | 2,492 | 25 (1982 loss) |

---

[9]Mr. Aunan erroneously used $8,650 of petitioner's loss carryforward to offset Rowe's Schedule C income.  See Calvin v. United States, 354 F.2d 202 (10th Cir. 1965) (cited with approval by Rose v. Commissioner, T.C. Memo. 1973-207).

The potential NOL carryforward to the years at issue, based upon petitioner's 1980-86 returns as filed, is $108,007.[10]

There was no examination of the NOL carryforwards during the audit and only a minimal examination of a portion of the NOL carryforwards by the IRS Appeals Office.  In support of the alleged NOL carryforwards, petitioner testified that, because of serious medical problems she experienced during 1982-86, her law practice during those years operated at a loss, generating part of the NOL carryforwards.  Petitioner testified that the Schedule E, Supplemental Income and Loss, losses generating the remaining part of the NOL carryforwards arose from the rehabilitation of a rental property.  Toward the end of the trial, petitioner introduced documentation in the form of deposit slips, canceled checks, and payment receipts for both her Schedule C and Schedule E income and expenses during 1978-83, but she did not offer any

---

[10]Petitioner's potential loss carryforward arises out of the following reported results for 1980-86:

| Year | Reported operating income (loss) | Operating loss utilization |
|------|-----------------------------------|-----------------------------|
| 1980 | ($41,399) | $7,382 carried back to 1977 |
| 1981 | 4,354 | Offset by 1980 loss |
| 1982 | (48,861) | -- |
| 1983 | (5,051) | -- |
| 1984 | 14,599 | Offset by 1980 loss |
| 1985 | (19,643) | -- |
| 1986 | (19,388) | -- |

Petitioner also reported operating losses in 1978 and 1979 which were carried back to 1976 and 1977.

testimony to explain the documentation.  Petitioner did not offer into evidence any documentation of her business income and expenses for 1984-86.

VII.  <u>Late Filing of Petitioner's 1987-90 Returns</u>

Petitioner filed her 1987 return on August 26, 1992, having requested and received two extensions, the second of which expired on October 15, 1988.  Petitioner and Rowe filed their 1988 joint return on August 27, 1992, and their 1989 and 1990 joint returns on August 25, 1992.  Neither petitioner and Rowe nor Mr. Aunan requested extensions of time to file the 1988-90 returns.

For each year at issue, petitioner gathered, organized, and summarized her Schedule C information and delivered it to Mr. Aunan for his use in preparing that year's return.  For the 1988-90 years, however, petitioner did not actually deliver her Schedule C information to Mr. Aunan until after the return due dates.  After petitioner submitted her Schedule C information to Mr. Aunan, she followed up by asking him periodically what additional information he needed to complete the returns.  Mr. Aunan normally responded with more requests for information; within a day or two, petitioner would supply the requested information to him.  In 1992, petitioner "threatened" Mr. Aunan, and the returns for all 4 years were finally completed and filed in August of that year.

At one point during petitioner's testimony, the following exchange occurred between the Court and petitioner:

>    THE COURT:  All right.  Now, let me ask another question.  You're a lawyer with a license at risk.  You knew you had an obligation to file a return and that that return had to be filed timely or you were going to have a problem.
>
>    THE WITNESS:  Right.
>
>    THE COURT:  Why didn't you protect yourself better?
>
>    THE WITNESS:  I suppose I've asked myself that a million times.  It -- I think part of -- when I think back on it, I was very used to going ahead and doing things, but, in this particular situation, [Rowe] had paid in no money for the self-employment tax, and it appeared that he was going to have a liability on his side of the fence.  And my push to get done and his reluctance and his being the primary contact with Aunan was not a good combination.
>
>    But, you know, all excuses aside, I have to be responsible for myself.  And I did not do in my own mind, which is -- what I should have done is -- I did not fire him.  I did not report him.  And I did not go to my old accountant and file a separate return, no matter what the economic consequences.

## VIII. October 17, 2000, Order

After respondent filed his status report and supplemental status report (SSR) describing the results of the parties' posttrial efforts to resolve outstanding issues, we issued an order dated October 17, 2000, which (1) listed the Schedule C income and deduction amounts remaining in dispute after respondent's further concessions, (2) ruled upon various exhibits, the admissibility of which had been left open at trial,

(3) closed the trial record, (4) invited, but did not require, the parties to file posttrial briefs, and (5) set a schedule for the filing of briefs.  Only respondent filed a posttrial brief.  In his posttrial brief, respondent continued to argue that some of petitioner's alleged business expenses should be disallowed but, with regard to certain expenses, asserted grounds for the disallowance that were different from the ground asserted in the notices of deficiency.

OPINION

I.  Schedule C Income and Deductions

   A.  Burden of Proof

   Normally, in a case before this Court, the taxpayer bears the burden of proof.  Rule 142(a).[11]  That burden has often been interpreted to mean that the taxpayer bears the ultimate burden of persuasion; i.e., the risk of nonpersuasion, as well as the initial burden of production.  See, e.g., Gerling Intl. Ins. Co. v. Commissioner, 86 T.C. 468, 476 n.5 (1986).

   In this case, petitioner bears the burden of proof.  Rule 142(a).  Because petitioner bears the burden of proof, petitioner has the initial burden of production, which requires her to

_____

   [11]Under certain circumstances, sec. 7491(a)(1), which was enacted in 1998, shifts the burden of proof to respondent.  Sec. 7491 applies to court proceedings arising in connection with examinations beginning after July 22, 1998.  Because the examination of petitioner's returns commenced before July 23, 1998, sec. 7491(a)(1) is inapplicable to this case.

introduce evidence sufficient, if believed, to demonstrate by a preponderance of the evidence that respondent's determination is excessive; i.e., erroneous and/or arbitrary, "without rational foundation".  Helvering v. Taylor, 293 U.S. 507, 514-515 (1935); see also Pittman v. Commissioner, 100 F.3d 1308, 1317 (7th Cir. 1996), affg. T.C. Memo. 1995-243; Page v. Commissioner, 58 F.3d 1342, 1347-1348 (8th Cir. 1995), affg. T.C. Memo. 1993-398.  If petitioner successfully carries her initial burden of production as to a particular adjustment, the burden of production; i.e., the burden of introducing evidence showing an adjustment is warranted, shifts to respondent.  Helvering v. Taylor, supra at 514-515; Berkery v. Commissioner, 91 T.C. 179, 186 (1988), affd. without published opinion 872 F.2d 411 (3d Cir. 1989); Cozzi v. Commissioner, 88 T.C. 435, 443-444 (1987); Jackson v. Commissioner, 73 T.C. 394, 401 (1979).

B.  Unreported Income Adjustments for 1987 and 1989

In this case, the parties agree that the unreported income adjustments arise from petitioner's law practice.  Our review of the record confirms that there is a sufficient evidentiary base, if one is required, to support a conclusion that petitioner was engaged in an income-generating activity during each of the years at issue and that petitioner has the burden of proving that income adjustments in the notices of deficiency were arbitrary

and/or excessive.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

At trial, petitioner proved, and respondent admitted, that the income adjustments proposed in respondent's notices of deficiency for all 4 of the years at issue were derived from two financial statements prepared by petitioner in 1987 and 1989. For 1987, respondent determined that petitioner had unreported Schedule C income equal to the "Employment Income" listed on the 1987 financial statement.  For 1988, 1989, and 1990, respondent added the "Employment Income" listed on the 1989 financial statement to the net profit or loss reported on petitioner's Schedules C for 1988, 1989, and 1990 to arrive at the income adjustments for 1988-1990.

During trial, respondent's counsel abandoned the income adjustments as originally determined in the notices of deficiency and offered as stipulated exhibits what purported to be bank deposits analyses for the years at issue.[12]  Based on the bank deposits analyses, respondent conceded the income adjustments for 1988 and 1990 in their entirety and substantially reduced the income adjustments for 1987 and 1989.

---

[12]In his opening statement, respondent's counsel stated that the bank deposits analyses were prepared because respondent's Appeals Office recognized that the income adjustments contained in the notice of deficiency that were based on the 1987 and 1989 financial statements were "not a strong position for the Service."

Because petitioner proved that respondent's reliance on the 1987 and 1989 financial statements under the circumstances involved in this case was unreasonable and resulted in substantially distorted income adjustments, we conclude that the adjustments to petitioner's Schedule C income as determined by respondent in the notices of deficiency were arbitrary and excessive. Therefore, the burden of producing credible evidence showing that respondent's revised adjustments to petitioner's Schedule C income in each of the years 1987 and 1989 were warranted shifted to respondent. Helvering v. Taylor, supra at 514-515; Commissioner v. Riss, 374 F.2d 161, 166 (8th Cir. 1967), affg. in part, revg. in part and remanding T.C. Memo. 1964-190.

Respondent contends that, even if the burden of production shifted to respondent regarding the income adjustments in the notice of deficiency, his revised income adjustments for each of the years 1987 and 1989 are supported by the bank deposits analyses respondent introduced into evidence. According to respondent, those analyses prove that petitioner deposited into her bank accounts substantially more money during 1987 and 1989 than she reported as gross receipts on her Schedules C for those years.

The bank deposits method has long been recognized as an acceptable indirect method of proving a taxpayer's understatement of income. See Gleckman v. United States, 80 F.2d 394 (8th Cir.

1935); see also United States v. Abodeely, 801 F.2d 1020, 1023-1025 (8th Cir. 1986); Caulfield v. Commissioner, T.C. Memo. 1993-423, affd. 33 F.3d 991 (8th Cir. 1994).  The bank deposits method is often used in cases in which the taxpayer maintained inadequate, incomplete, or unclear records.  See, e.g., Holland v. United States, 348 U.S. 121 (1954); DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977).

In this case, petitioner produced records of her taxable income, including her Schedule C income.  The records included handwritten ledger books as well as bank records such as bank statements and deposit tickets.  A review of petitioner's income records establishes to the Court's satisfaction that the gross income reported on petitioner's Schedules C for 1987 and 1989 was derived from petitioner's handwritten ledger books and was not calculated based on deposits into petitioner's bank accounts. The return preparer, Mr. Aunan, took the gross receipts numbers that petitioner derived from her ledger books for the years at issue and adjusted the numbers for any refunds made to petitioner's clients during the taxable years.  In 1987 Mr. Aunan made no adjustments to petitioner's Schedule C gross receipts of $75,097, but, in 1989, Mr. Aunan reduced the preliminary gross receipts figure of $129,146 by client refunds of $470 and

$4,213[13] to arrive at petitioner's 1989 reported Schedule C gross receipts of $124,463.

Respondent arbitrarily used entries from the 1987 and 1989 financial statements to substantially increase petitioner's Schedule C income in the notices of deficiency. When respondent recognized the inherent weakness of his position, respondent attempted to salvage his position that income adjustments were warranted by arranging for the preparation of what purported to be bank deposits analyses. The analyses, however, failed adequately to adjust for nontaxable items, failed to analyze all of petitioner's bank accounts, and failed to adjust for all of petitioner's reported taxable income. Respondent did not obtain and review all of petitioner's bank records, including copies of deposited items, and it is apparent from a review of the analyses that respondent did not obtain the information necessary to prepare a proper bank deposits analysis for either 1987 or 1989.

A review of respondent's bank deposits analysis for 1987, which was similar in method to the one for 1989, illustrates why we assign no credibility to respondent's bank deposits analyses and related income determinations for 1987 and 1989. The 1987 bank deposits analysis is an analysis of one of petitioner's bank accounts that she used during that year. ANB account No. 302-

---

[13]Respondent has conceded that client refunds of $4,213.30 are deductible.

733-1 was an account maintained by petitioner throughout 1987 into which petitioner deposited client fees as well as amounts unrelated to her law practice. The deposits analysis purports to add up all of the deposits made into the account during 1987 by month, subtract identified nontaxable deposits from the computed total deposits, and arrive at "Gross Revenues per the Audit". The analysis subtracts from that number the "Gross Revenues per the Tax Return" to arrive at respondent's revised income adjustment.

Respondent's calculation of total deposits as reflected on the 1987 bank deposits analysis contains several obvious errors. For example, for January and July, respondent erroneously listed total deposits shown on the relevant bank statements. For March and December, respondent did not have copies of the relevant bank statements, so respondent used petitioner's income listing from her ledger book for those months.

When respondent's calculation of nontaxable items is compared to the relevant bank statements for account No. 302-733-1, even more troublesome concerns arise. Petitioner had a "Ready Cash" line of credit that, among other uses, covered overdrafts on the account. Respondent treated some but not all of the "Ready Cash" deposits during 1987 as nontaxable deposits. Respondent also failed to subtract, as nontaxable deposits, a $5,738 disbursement on a note (July 7, 1987), a $2,625.01

disbursement on a note (Nov. 16, 1987), and several transfers from account No. 109-070-3, totaling $22,509.69. Respondent also failed adequately to adjust his calculation for the total amount of rental income, loan repayments, and installment sale income that petitioner received during 1987. Similar mistakes were made in the bank deposits analysis for 1989.

Our review confirms that the simplistic bank deposits analyses prepared and relied upon by respondent to support his restated income adjustments against petitioner for 1987 and 1989 are simply not credible. We conclude, therefore, that respondent's determinations that petitioner had unreported Schedule C income for 1987 and 1989 are erroneous, and we hold that respondent's determinations of unreported income for 1987 and 1989 are not sustained.

C. Schedule C Deductions

1. Applicable Legal Principles

The only basis asserted by respondent in the notices of deficiency for disallowing petitioner's Schedule C expenses was petitioner's alleged failure to establish that the expenses were "paid or incurred during the taxable year" and were "ordinary and necessary to * * * [petitioner's] business." Section 162(a) authorizes a taxpayer to deduct ordinary and necessary business expenses paid or incurred during the taxable year in carrying on a trade or business. An "ordinary" expense is one incurred in a

transaction that commonly or frequently occurs in the type of business involved. Deputy v. DuPont, 308 U.S. 488, 495 (1940). A "necessary" expense is one that is "appropriate and helpful" to the taxpayer's business. Welch v. Helvering, 290 U.S. at 113. Expenses allowable under section 162 must be "directly connected with or pertaining to the taxpayer's trade or business". Sec. 1.162-1(a), Income Tax Regs. Personal, living, and family expenses are not deductible. Sec. 262(a).

Generally, if a claimed business expense is deductible, but the taxpayer is unable to substantiate it fully, the Court is permitted to make an approximation of an allowable amount (the Cohan rule). Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). The estimate, however, must have a reasonable evidentiary basis. Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).

Respondent asserts for the first time in his trial memorandum that certain of petitioner's Schedule C deductions are also subject to the requirements of section 274. Section 274 supersedes the Cohan rule, see sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985), and imposes more stringent substantiation requirements for travel, meals and entertainment, gifts, and with respect to any listed property as defined in section 280F(d)(4). Sec. 274(d). Listed property includes any passenger automobile. Sec. 280F(d)(4)(A)(i).

Section 274(a) provides, in pertinent part, that no deduction otherwise allowable shall be allowed for entertainment, amusement, or recreation expense unless the taxpayer establishes that the expense was directly related to the active conduct of the taxpayer's trade or business.  Section 274(b) provides, in pertinent part, that no deduction shall be allowed under section 162 for any gift to the extent that the gift, together with other gifts to the same individual for the same taxable year, exceeds $25.  Section 274(d) requires a taxpayer to substantiate a claimed expense that is covered by section 274 by adequate records or by sufficient evidence corroborating the taxpayer's own statement establishing the amount, time, place, business purpose of the expense, and the business relationship to the taxpayer of the persons entertained or receiving the gift. Section 274(k) provides in pertinent part that no deduction is allowed for any food or beverage expense unless the expense is not lavish or extravagant under the circumstances and the taxpayer or an employee of the taxpayer is present at the furnishing of the food or beverage expense.

Section 274(n) provides that the amount allowable as a deduction for food and beverage expense and entertainment expense shall not exceed 80 percent of the amounts that would be deductible but for section 274(n).  However, meals that qualify as de minimis fringe benefits are not subject to the 20-percent

deduction disallowance imposed by section 274(n)(1).  See sec.
274(n)(2)(B).  Section 132(e) generally defines the term "de
minimis fringe" as "any property or service the value of which is
(after taking into account the frequency with which similar
fringes are provided by the employer to the employer's employees)
so small as to make the accounting for it unreasonable or
administratively impracticable."  See also sec. 1.132-6(a),
Income Tax Regs.

    2.  Analysis

It is well established that the burden of proof with respect
to deductions claimed on a tax return generally rests on the
taxpayer.  The general rule was succinctly stated by this Court
in Roberts v. Commissioner, 62 T.C. 834, 836 (1974), as follows:

> Taxpayers have no inherent right to deductions; they
> are matters of legislative grace.  Interstate Transit
> Lines v. Commissioner, 319 U.S. 590, 593 (1943); New
> Colonial Ice Co. v. Helvering, 292 U.S. 435, 440
> (1934).  The taxpayer must be able to point to some
> particular statute to justify his deduction and
> establish that he comes within its terms.  Deputy v.
> Dupont, 308 U.S. 488, 493 (1940); White v. United
> States, 305 U.S. 281 (1938).  * * *

In Roberts, the taxpayer argued that the Commissioner's
blanket disallowance of his business expense deductions (and a
casualty loss) without benefit of audit was arbitrary and
unreasonable and, therefore, could not form the basis for a
deficiency.  In Roberts, we noted that the Commissioner's failure
to audit the taxpayer's records was due solely to the latter's

refusal to furnish any records in support of the claimed deductions. We held that "when a taxpayer refuses to substantiate his claimed deductions, the Commissioner is not arbitrary and unreasonable in determining that the deductions should be denied." Id. at 837.

Unlike the taxpayer in Roberts, petitioner did not refuse to substantiate her deductions. In fact, she provided voluminous documentation on several occasions and for extended periods of time to respondent's revenue agent, Appeals officer, trial counsel, and to this Court. Respondent's blanket disallowance of petitioner's Schedule C deductions in the notices of deficiency for 3 of the 4 years at issue was preceded by the revenue agent's apparent failure or refusal to examine the expense records that petitioner had produced for his inspection. Although petitioner's expense records (consisting, for the most part, of canceled checks, cash receipts, credit card statements, and other pertinent documents) may not have been kept in a form pleasing to the revenue agent, they were coded and organized by category, they satisfied the books and records requirement of section 1.6001-1(a), Income Tax Regs., and they were auditable. See Jackson v. Commissioner, 59 T.C. 312, 317-318 (1972). Respondent's disallowance of all of petitioner's Schedule C expenses for 3 of the 4 years at issue without any meaningful

examination of petitioner's business records for those years appears unwarranted and arbitrary.

As arbitrary as respondent's blanket disallowance of petitioner's Schedule C expenses for 3 of the 4 years at issue appears on these facts, however, it is nevertheless clear under our jurisprudence and that of the Court of Appeals for the Eighth Circuit that petitioner bears the burden of proof as to her deductions. We are obligated to analyze the evidentiary record and to weigh the evidence in order to decide if petitioner has carried her burden of persuading this Court that respondent's disallowance of her Schedule C deductions for the years at issue was erroneous and/or arbitrary. See Oliver v. Commissioner, 364 F.2d 575, 577 (8th Cir. 1966), affg. T.C. Memo. 1965-83.

The record in this case establishes that petitioner maintained an active law practice during the years at issue. In connection with that law practice, petitioner paid business expenses that were categorized and deducted on her Schedules C as advertising, car and truck, depreciation/section 179, employee benefits, insurance, interest, legal and professional, rent, supplies, taxes, travel, meals and entertainment, utilities, wages, dues and subscriptions, process services, contract services, court fees, collection fees, bank charges, and miscellaneous expenses. With the assistance of Mr. Aunan's workpapers, we were able to ascertain, to a large extent, how

petitioner's expenses were grouped for tax return purposes.  We shall review each Schedule C expense category[14] and the evidence in support of each category to reach a conclusion regarding the parties' respective positions.  Our conclusions are summarized in a chart that appears at the end of this subsection on page 79.

### a.  Depreciation and Section 179 Expense

For the years at issue, petitioner claimed depreciation expense deductions in the following amounts:

| Year | Amount |
|------|--------|
| 1987 | $2,546 |
| 1988 | 11,974 |
| 1989 | 2,444 |
| 1990 | 1,467 |

The depreciation schedule included as part of Mr. Aunan's workpapers shows that the depreciation expense deductions were calculated as follows:

---

[14]We have not addressed separately the Schedule C category of collection fees that was included only on petitioner's 1989 return, but we have considered any such expenses as part of other categories.

| Year acq. | Asset | Cost | Depreciation expense 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|---|---|
| 1987 | Furniture & fixtures | $10,543 | $2,109 | $3,374 | $2,024 | $1,215 |
| | Computer | 2,186 | 437 | 700 | 420 | 252 |
| 1988 | Furniture & fixtures | 2,630 | | [1]2,630 | | |
| | Computer | 5,270 | | [1]5,270 | | |
| | Total depreciation and sec. 179 exp. | | 2,546 | 11,974 | 2,444 | 1,467 |

[1]These amounts were claimed as sec. 179 expenses.

The detail in Mr. Aunan's workpapers shows that, during 1987, petitioner purchased furniture costing $3,003 and a copier costing $3,069 and made leasehold improvements costing $4,471. The total of these three items is $10,543, the amount used by Mr. Aunan in calculating the depreciation expense attributable to furniture and fixtures for the years at issue. The detail also shows that, during 1987, petitioner purchased a computer costing $2,186, a figure that ties into Mr. Aunan's depreciation schedule.

Documents introduced into evidence at trial establish the following:

(1) Petitioner purchased a computer for $2,186 during 1987 (Ex. 38-R, line 211).[15]

_____

[15]Ordinarily, we do not include citations to the record in our opinions. In this case, however, references to line items in
(continued...)

(2) Petitioner expended $4,471.12 for office improvements during 1987 (Ex. 38-R, lines 222-228).

(3) Petitioner purchased a copier for $3,068.64 during 1987 (Ex. 38-R, lines 323-332).

(4) Petitioner purchased computer furniture for $3,003.09 during 1987 (Ex. 38-R, lines 212-218).

(5) Petitioner purchased office furniture and computer-related items during 1988 totaling at least $5,632.26.[16]

Respondent has conceded that petitioner expended the above-listed amounts and that petitioner may depreciate these items but attempts to reconfigure petitioner's deduction by offering a different depreciation alternative (7-year depreciation). We reject respondent's attempt to recalculate petitioner's depreciation and section 179 expense deduction because respondent, who raised this issue for the first time in a supplemental status report filed after trial, had the burden of producing evidence regarding the proposed recalculation and

---

[15](...continued)
the summary exhibits, Exhibits 38-R through 41-R, will assist the parties in understanding which items we are allowing petitioner to deduct and in preparing the Rule 155 computations.

[16]Our inability to account for the full cost of items purchased during 1988 and included in the sec. 179 expense deduction claimed by petitioner is attributable to the fact that petitioner's depreciation and sec. 179 records were unbundled during the pretrial review of petitioner's records and mixed in with petitioner's office supplies records. We have no doubt, however, that petitioner expended the amounts claimed for 1988 (Ex. 39-R, lines 228-238, 241, 243-246, 248-259).

failed to introduce any evidence to show that the recalculation is required.

Petitioner has substantiated her depreciation and section 179 expense deduction for each of the years at issue, and the deductions in the amounts claimed are allowed.

### b. Bank Service Charges

Petitioner deducted bank service charges on her Schedules C for the years at issue as follows:

| Year | Amount |
|------|--------|
| 1987 | $469 |
| 1988 | 1,035 |
| 1989 | 120 |
| 1990 | 120 |

A review of petitioner's bank records establishes that petitioner incurred service charges, insufficient funds charges, returned item charges, and miscellaneous other charges such as those for check orders.  For example, during 1987, with regard to petitioner's ANB account No. 302-733-1 alone, petitioner paid $184.25 in service charges, $413 in insufficient fund and returned item charges, and $84.75 in check charges for 10 months (bank statements for 2 months were missing).  Although all of petitioner's bank records were not introduced into evidence, we have no doubt that in each of the years at issue petitioner paid bank charges related to her law practice.  Applying the Cohan rule, we allow petitioner the deductions claimed for bank service charges for each of the years at issue.

### c.  Dues and Publications

For the years at issue, petitioner claimed deductions for dues and publications as follows:

| Year | Amount |
|------|--------|
| 1987 | $2,337 |
| 1988 | 3,867 |
| 1989 | 2,675 |
| 1990 | 4,095 |

Mr. Aunan's workpapers reveal that the dues and publications category on petitioner's returns included expenses paid by petitioner during the years at issue for her law library, bar and other dues, continuing professional education, and her reception room subscriptions as follows:

| Year | Law library | CPE, dues & subs. | Total |
|------|-------------|-------------------|-------|
| 1987 | $1,552 | $785 | $2,337 |
| 1988 | 3,530 | 337 | 3,867 |
| 1989 | 1,996 | 679 | 2,675 |
| 1990 | 1,468 | 2,627 | [1]4,095 |

[1]It appears from a review of Mr. Aunan's workpapers that he erroneously included the amount of $1,468 twice when calculating petitioner's 1990 deduction for dues and publications.

The record establishes that:

(a) During 1987, petitioner paid office book expenses of $1,552.44 (Ex. 38-R, lines 152-160), continuing education expenses of $549.20 (Ex. 38-R, lines 726-732), office magazine expenses of $47.92 (Ex. 38-R, lines 124-126), and dues and publications expenses of $2,321.48 (Ex. 38-R, lines 996-997, 1000-1003, 1016, 1033, 1038, 1045, 1051-1052, 1060, 1064, 1123,

1128-1129, 1135, 1144, 1151, 1157, 1172, 1174, 1176), for a total amount documented of $4,471.04.

(b) During 1988, petitioner paid office book expenses of $3,678.04 and subscriptions and memberships of $360.52, for a total amount documented of $4,038.56 (Ex. 39-R, lines 25-32, 35-38, 42-63).

(c) During 1989, petitioner paid office book and subscription expenses of $1,974 (Ex. 40-R, lines 166-184, 186-205) and a fee of $50 to the Minnesota Women Lawyers Association (Ex. 40-R, line 142), for a total amount documented of $2,024. In addition, Mr. Aunan's workpapers suggest that when he was working on petitioner's return for 1989, petitioner also had given him documentation of two other expense items of $412 and $217.

(d) During 1990, petitioner paid office book and subscription expenses of $1,475.07, professional organization fees of $310.50, continuing legal education expenses of $247.50, and office book expenses of $278.90, for a total amount documented of $2,311.97 (Ex. 41-R, lines 120-147, 428-431, 846-852, 1290-1297).

Petitioner is entitled to deduct dues and subscriptions expenses in each of the years at issue in the amounts summarized above and set forth in the chart on page 79 of this opinion.

### d.  Legal and Professional

For the years at issue, petitioner claimed deductions for legal and professional fees paid in connection with her law practice as follows:

| Year | Amount |
|------|--------|
| 1987 | $5,104 |
| 1988 | 7,239 |
| 1989 | 6,128 |
| 1990 | 13,536 |

Mr. Aunan's workpapers reveal that the following entries comprised the deducted amounts:

(a) For 1987, amounts of $158, $1,620, $760, and $2,566, for a total amount deducted of $5,104;

(b) for 1988, amounts of $4,962 and $2,277, for a total amount deducted of $7,239;

(c) for 1989, amounts of $4,965, $88 and $1,075, for a total amount deducted of $6,128;

(d) for 1990, amounts of $18,066 and $10,470, reduced by a $15,000 payment to James Van Valkenburg, for a total amount deducted of $13,536.

Our review of the record reveals the following:

(a) During 1987, petitioner paid fees to other attorneys of $2,566, fees to law clerks of $760.02, fees to experts of $1,620.20, and fees for medical records of $158, for a total expenditure of $5,104.22 (Ex. 38-R, lines 250-261, 317-319, 766-777, 750-754).

(b) During 1988, petitioner paid fees to other professionals of $7,145.55 and printer expenses of $2,277.63, for a total expenditure of $9,423.18 (Ex. 39-R, lines 67-100, 680-692).

(c) During 1989, petitioner paid fees to other professionals in the aggregate amount of $6,140.18 (Ex. 40-R, lines 91-119).

(d) During 1990, petitioner paid fees to other professionals in the aggregate amount of $28,533.59.  After reducing the amount paid by the $15,000 payment to Mr. Van Valkenburg, the total expenditure documented by petitioner was $13,533.59 (Ex. 41-R, lines 538-585).

Petitioner is entitled to deduct legal and professional fees in each of the years at issue in the amounts summarized above and set forth in the chart at page 79 of this opinion.

### e.  Process Services

For the years at issue, petitioner claimed deductions for process services obtained as part of her law practice as follows:

| Year | Amount |
|------|--------|
| 1987 | $2,482 |
| 1988 | 2,495 |
| 1989 | 915 |
| 1990 | 1,822 |

Mr. Aunan's workpapers reveal that the following entries comprised the deducted amounts:

(a) For 1987, a cumulative amount of $2,482;

(b) for 1988, amounts of $2,373 and $122, for a total amount deducted of $2,495;

(c) for 1989, amounts of $607, $300 and $8, for a total amount deducted of $915;

(d) for 1990, amounts of $1,816 and $7, for a total amount of $1,823.[17]

Our review of the record reveals the following:

(a) During 1987, petitioner paid, and respondent concedes the deductibility of, courier services totaling $2,541.70 (Ex. 38-R, lines 74-114).

(b) During 1988, petitioner paid, and respondent concedes the deductibility of, process service fees totaling $2,373.28 (Ex. 39-R, lines 599-648).

(c) During 1989, petitioner paid, and respondent concedes the deductibility of, process service fees and other transportation expenses totaling $570.70 (Ex. 40-R, lines 377-398).

(d) During 1990, petitioner paid, and respondent concedes the deductibility of, process server fees of $556.08 and messenger service fees of $1,353.08, the total of which is $1,909.16 (Ex. 41-R, lines 506-524, 607-646).

Petitioner is entitled to deduct process service and transportation expenses in each of the years at issue in the

_____

[17]Although the amounts shown on Mr. Aunan's workpapers total $1,823, the amount claimed on the tax return was $1,822.

amounts summarized above and set forth in the chart at page 79 of this opinion.

### f. Court Fees

For the years at issue, petitioner claimed deductions for court fees paid in connection with her law practice as follows:

| Year | Amount |
|------|--------|
| 1987 | $2,002 |
| 1988 | 7,458 |
| 1989 | 9,104 |
| 1990 | 6,699 |

Mr. Aunan's workpapers reveal that the following entries comprised the deducted amounts:

(a) For 1987, amounts of $357, $1,924, and $221, for a total amount deducted of $2,002 (it appears that a computational mistake was made here as the total of the listed amounts is $2,502);

(b) for 1988, amounts of $6,176 and $1,282, for a total amount deducted of $7,458;

(c) for 1989, amounts of $7,890, $955, and $259, for a total amount deducted of $9,104;

(d) for 1990, amounts of $3,357, $20, $193, $2,196, and $933, for a total amount deducted of $6,699.

Our review of the record reveals the following:

(a) During 1987, petitioner paid, and respondent concedes the deductibility of, court fees of $1,933.65 (Ex. 38-R, lines

353-423) and $759 (Ex. 38-R, lines 966-995), for a total amount documented of $2,692.65.

(b) During 1988, petitioner paid, and respondent concedes the deductibility of, court fees of $1,548.25 (Ex. 39-R, lines 386-433), $2,947.88 (Ex. 39-R, lines 437-530), and $57.50 (Ex. 39-R, lines 1647-1654), for a total amount documented of $4,553.63.

(c) During 1989, petitioner paid, and respondent concedes the deductibility of, court fees of $10.61 (Ex. 40-R, line 220), $944.57 (Ex. 40-R, lines 270, 272-326), and $7,316.23 (Ex. 40-R, lines 662-729, 731-752, 754-755, 757, 759-760, 762-789, 793, 797-800, 804, 806, 808-812, 815-825, 827-844), for a total amount documented of $8,271.41.

(d) During 1990, petitioner paid, and respondent concedes the deductibility of, court fees of $3,113.45 (Ex. 41-R, lines 435-502) and expert fees of $3,796.57 (Ex. 41-R, lines 589-603), for a total amount documented of $6,910.02.

Petitioner is entitled to deduct court and expert fees in each of the years at issue in the amounts summarized above and as set forth in the chart at page 79 of this opinion.

### g. Contract Services

For the years at issue, petitioner claimed deductions for contract services obtained as part of her law practice as follows:

| Year | Amount |
|------|--------|
| 1987 | $4,637 |
| 1988 | 10,618 |
| 1989 | 9,617 |
| 1990 | 10,079 |

Mr. Aunan's workpapers reveal that the following entries comprised the deducted amounts:

(a) For 1987, amounts of $3,849 and $788, for a total amount deducted of $4,637;

(b) for 1988, a cumulative amount of $10,618;

(c) for 1989, amounts of $9,490 and $127, for a total amount deducted of $9,617;

(d) for 1990, a cumulative amount of $10,079.

Our review of the record reveals the following:

(a) During 1987, petitioner paid, and respondent concedes the deductibility of, contract services of $3,849.52 (Ex. 38-R, lines 39-60) and $788.25 (Ex. 38-R, lines 790-799), for a total amount documented of $4,637.77.

(b) During 1988, petitioner paid, and respondent concedes the deductibility of, contract services of $10,759.31 (Ex. 39-R, lines 696-755).

(c) During 1989, petitioner paid, and respondent concedes the deductibility of, contract services of $9,748.39 (Ex. 40-R, lines 575-658 (excluding items conceded by petitioner)).

(d) During 1990, petitioner paid, and respondent concedes the deductibility of, contract services of $10,079.24 (Ex. 41-R, lines 18-49).

Petitioner is entitled to deduct amounts paid for contract services in each of the years at issue in the amounts summarized above and set forth in the chart at page 79 of this opinion.

### h. Moving Expenses

For 1987, petitioner claimed a deduction for moving expenses in the amount of $3,258. Mr. Aunan's workpapers reveal that the amount deducted consisted of expenses of $412 and $2,846. Our review of the record reveals that petitioner paid, and respondent concedes the deductibility of, office moving expenses of $412.25 (Ex. 38-R, lines 336-340) and $2,845.82 (Ex. 38-R, lines 169-173), for a total amount documented of $3,258.07.

Petitioner is entitled to deduct moving expenses of $3,258.07 for 1987, as conceded by respondent and as shown on the chart at page 79 of this opinion.

### i. Insurance

For the years at issue, petitioner claimed deductions for insurance paid in connection with her law practice as follows:

| Year | Amount |
|------|--------|
| 1987 | $514   |
| 1988 | 3,677  |
| 1989 | 3,745  |
| 1990 | 3,565  |

Mr. Aunan's workpapers reveal that the following entries comprised the deducted amounts:

(a) For 1987, a cumulative amount of $514;

(b) for 1988, a cumulative amount of $3,677;

(c) for 1989, amounts of $3,578 and $167, for a total amount deducted of $3,745;

(d) for 1990, amounts of $376, $397, and $2,792, for a total amount deducted of $3,565.

Our review of the record reveals the following:

(a) In July, November, and December 1987, petitioner paid amounts to State Farm Insurance totaling $414.92, all of which respondent concedes are deductible (Ex. 38-R, lines 311-313).

(b) At various times during 1987, petitioner also paid for employee health insurance from Blue Cross/Blue Shield and travel insurance from Sid Murray Co. and Mutual of Omaha in amounts totaling $541.97, all of which respondent concedes are deductible (Ex. 38-R, lines 232-241). Some monthly payments to Blue Cross/ Blue Shield are not listed and appear to be missing.

(c) At various times during 1987, petitioner also paid additional amounts to State Farm Insurance ($342.27) (Ex. 38-R, lines 1017-1018) and the Administrator MSBA Plan ($21.60) (Ex. 38-R, line 1021) that respondent does not concede but we conclude are deductible.

(d) During 1988, petitioner made payments to Blue Cross/Blue Shield for employee health insurance ($1,010.32) (Ex. 39-R, lines 104-110), DCA for unspecified insurance ($397) (Ex. 39-R, lines 126-127), and Minnesota Department of Jobs & Training for unemployment compensation insurance ($382.44) (Ex. 39-R, lines 140-147), all of which respondent concedes are deductible.

(e) During 1988, petitioner also made payments of $1,586.90 to State Farm Insurance Co. for office and equipment insurance and for car insurance (Ex. 39-R, lines 116-125), $144.03 to Confederation Life Insurance Co. for office insurance (Ex. 39-R, lines 111-114), and $39 to Mutual of Omaha and Sid Murray Co. for travel insurance (Ex. 39-R, lines 115, 131-132). Although respondent does not concede that these amounts are deductible, we hold that the above-listed items are deductible, and we note that respondent has conceded similar items for 1989.

(f) During 1989, petitioner made payments to State Farm Insurance for office insurance, to Sid Murray Co. and Mutual of Omaha for travel insurance, to Blue Cross/Blue Shield for employee health insurance, to Confederation Life Insurance Co. for office insurance, to Lutheran Brotherhood for office insurance, and miscellaneous other companies, totaling $2,768.80, all of which respondent concedes are deductible.

(g) During 1989, petitioner paid additional office insurance that respondent does not concede is deductible but that we hold

is deductible.  The additional documented amounts total $1,096.51 (Ex. 40-R, lines 474-476, 479, 481-482).

(h) During 1990, petitioner paid employee life insurance, employee health insurance, and workers' compensation and unemployment insurance totaling $1,543.64, all of which respondent concedes are deductible (Ex. 41-R, lines 9-14, 842-843; SSR dated 9/10/99).

(i) During 1990, petitioner also made payments to Blue Cross/Blue Shield, Sid Murray Co. and Mutual of Omaha for office and travel insurance ($518.98) that petitioner documented and respondent concedes are deductible (Ex. 41-R, lines 365-368, 378-379).

(j) During 1990, petitioner made other insurance payments, the amount and business purpose of which she documented at trial. Although respondent does not concede that these payments are deductible, we hold that they are deductible because petitioner has credibly testified with regard to their business purpose. The payments total $1,303.19 (Ex. 41-R, line 369).

Petitioner is entitled to deduct business insurance that she paid in each of the years at issue in the amounts summarized above and shown on the chart at page 79 of this opinion.

### j.  Utilities

For the years at issue, petitioner claimed deductions for utilities as follows:

| Year | Amount |
|------|--------|
| 1987 | $838 |
| 1988 | 3,784 |
| 1989 | 6,152 |
| 1990 | 3,515 |

Mr. Aunan's workpapers reveal that the following entries comprised the deducted amounts:

(a) For 1987, a cumulative amount of $838;

(b) for 1988, amounts of $2,449, $1,318, $14, and $3, for a total amount deducted of $3,784;

(c) for 1989, amounts of $1,257, $4,404, $458, and $33, for a total amount deducted of $6,152;

(d) for 1990, amounts of $3,385, $17 and $113, for a total amount deducted of $3,515.

Our review of the record reveals the following:

(a) For 1987, petitioner documented, and respondent conceded the deductibility of, $1,572.19 and $333.45 of payments to Northwestern Bell (Ex. 41-R, lines 142-143, 146-148, 1068-1069, and SSR dated 9/10/99, line 1093) and utility payments to NSP in October and December of $419.21 (Ex. 38-R, lines 825-826), for a total amount documented of $2,324.85.

(b) For 1988, petitioner documented, and respondent conceded the deductibility of, telephone expenses paid to American Paging, US West, and Northwestern Bell of $2,757.51 (Ex. 39-R, lines 315-326, 328, 330, 333-334). Petitioner also documented, but respondent does not concede the deductibility of, utility

expenses paid to NSP totaling $1,317.82 (Ex. 39-R, lines 668-676). Because petitioner has substantiated the payments to NSP, which are consistent with utility payments in other years that respondent did concede, we conclude that the payments to NSP during 1988 are deductible utility expenses.

(c) For 1989, petitioner documented, and respondent concedes the deductibility of, payments to NSP of $1,715.43 (Ex. 40-R, lines 357-363, and SSR dated 9/10/99) and telephone and Metagram expenses totaling $4,331.05 (Ex. 40-R, lines 331-334, 337-344, 346-347, 349-351, 353).

(d) For 1990, petitioner documented payments of $3,401.87 (the amount of which equals the sum of two of the three entries on Mr. Aunan's workpapers) (Ex. 41-R, lines 330-354). Of the payments documented, respondent concedes the deductibility of certain payments made to US West Cellular, NSP, American Paging, AT&T, and US West Communications totaling $3,012.53 (Ex. 41-R, lines 335-345, and SSR dated 9/10/99). Petitioner testified at trial that she was entitled to additional amounts for cellular phone service and for certain AT&T expenses for the office phones. We accept petitioner's testimony as credible, and we allow her additional phone expense of $233.74 (Ex. 41-R, lines 331-334, 346, 348).

Petitioner is entitled to deduct utility expenses in each of the years at issue in the amounts summarized above and shown on the chart at page 79 of this opinion.

### k. Supplies

For the years at issue, petitioner claimed deductions for supplies purchased for her law practice as follows:

| Year | Amount |
|------|--------|
| 1987 | $4,174 |
| 1988 | 12,297 |
| 1989 | 13,139 |
| 1990 | 7,263 |

Mr. Aunan's workpapers, which describe this category of expenses as "Office Supplies & Postage", reveal that the following entries comprised the deducted amounts:

(a) For 1987, amounts of $2,106, $653, and $1,415, for a total amount deducted of $4,174;

(b) for 1988, amounts of $4,076, $1,195, $5,932, and $1,094, for a total amount deducted of $12,297;

(c) for 1989, amounts of $6,762, $2,088, $378, $1,450, $2,422, and $39, for a total amount deducted of $13,139;

(d) for 1990, amounts of $1,423, $3,307, $619, and $1,914, for a total amount deducted of $7,263.

Our review of the record reveals the following:[18]

_____

[18]Petitioner disputes respondent's failure to allow additional expenditures that she made and deducted as office supplies.  In many but not all instances, petitioner credibly

(continued...)

(a) During 1987, petitioner paid for, and documented for purposes of this case, office supplies and postage summarized below, the deductibility of which respondent has conceded:

| | | |
|---|---|---|
| Office postage | $653.36 | (Ex. 38-R, lines 4-29) |
| Office supplies | 2,015.75 | (Ex. 38-R, lines 427-481, excl. 438, 445, 447, 455) |
| Sec. B postage | 359.37 | (Ex. 38-R, lines 918-932) |
| Sec. B supplies | 1,181.29 | (Ex. 38-R, lines 938-951, excl. 947) |
| Total | 4,209.77 | |

(b) During 1988, petitioner paid for, and documented for purposes of this case, office supplies and postage summarized below, the deductibility of which respondent has conceded:

| | | |
|---|---|---|
| Office supplies | $3,607.36 | (Ex. 39-R, lines 197-259 (in amount allowed column)) |
| Office supplies | 2,960.81 | (Ex. 39-R, lines 271-309) |
| Postage, etc. | 2,520.70 | (Ex. 39-R, lines 542-573) |
| Sec. B off. supplies | 183.82 | (Ex. 39-R, lines 1313-1433 (in amount allowed column)) |
| Sec. B postage | 141.99 | (Ex. 39-R, lines 1571-1589) |
| Total | 9,414.68 | |

(c) During 1989, petitioner paid for, and documented for purposes of this case, office supplies and postage summarized below, the deductibility of which respondent has conceded:

---

[18](...continued)
testified regarding the business purpose of the expenditure at trial, and/or the documentation presented at trial contains a contemporaneous notation of the business purpose of the item. In addition, respondent has conceded the deductibility of other expenses that could be categorized as supplies. We shall account for these additional expenses as miscellaneous expenses later in this analysis.

| | | |
|---|---|---|
| Office supplies | $7,954.92 | (Ex. 40-R, lines 4-87 (amount allowed column plus line 65)) |
| Office postage | 378.46 | (Ex. 40-R, lines 123-127) |
| Office furniture | 38.00 | (Ex. 40-R, line 214) |
| Postage | 2,041.23 | (Ex. 40-R, lines 432-468 (amount allowed column)) |
| Sec. B off. supplies | 13.59 | (Ex. 40-R, line 1445) |
| Sec. B postage | 79.97 | (Ex. 40-R, lines 1451-1465) |
| Sec. B additional supplies | 279.28 | (Ex. 40-R, lines 1666-1763 (amount allowed column)) |
| Total | 10,785.45 | |

(d) During 1990, petitioner paid for, and documented for purposes of this case, office supplies and postage summarized below, the deductibility of which respondent has conceded:

| | | |
|---|---|---|
| Office supplies | $3,330.25 | (Ex. 41-R, lines 210-260) |
| Office expense | 1,064.73 | (Ex. 41-R, lines 264, 266-267,271, 273-277, 279-285, 299, 302-304; SSR dated 9/10/99) |
| Copier | 844.36 | (Ex. 41-R, lines 358-361) |
| Printing expenses | 619.31 | (Ex. 41-R, lines 383-391) |
| Postage | 1,422.78 | (Ex. 41-R, lines 395-415) |
| Sec. B off. supplies | 1,151.08 | (Ex. 41-R, lines 1242-1285 (amount allowed column)) |
| Sec. B off. misc. | 117.63 | (Ex. 41-R, lines 1312-1343 (amount allowed column)) |
| Sec. B postage (cash) | 108.45 | (Ex. 41-R, lines 1348-1363) |
| Sec. B credit card | 2,501.32 | (Ex. 41-R, lines 1395-1424 (amount allowed column)) |
| Sec. B printing | 17.21 | (Ex. 41-R, line 1598) |
| Sec. C credit card | 244.14 | (Ex. 41-R, lines 1668-1669, 1679-1681) |
| Total | 11,421.26 | |

Petitioner is entitled to deduct payments made for supplies in each of the years at issue in the amounts summarized above and shown on the chart at page 79 of this opinion.

## 1. Wages and Employee Benefits

For the years at issue, petitioner claimed deductions for wages and employee benefits paid in connection with her law practice as follows:

| Year | Wages | Employee Benefits |
|------|-------|-------------------|
| 1987 | $13,991 | $2,057 |
| 1988 | 19,203 | 2,243 |
| 1989 | 26,238 | 5,274 |
| 1990 | 29,054 | 3,998 |

Mr. Aunan's workpapers reveal that the following entries comprised the deducted amounts:

(a) For 1987, the wage deduction was derived by adding expenditures of $3,042 and $10,949, and the employee benefit deduction was an aggregate amount of $2,057.

(b) For 1988, the wage deduction was derived by adding expenditures of $15,766 and $3,437, and the employee benefit deduction was derived by adding expenditures of $2,076, $134, and $33.

(c) For 1989, the wage deduction was derived by adding expenditures of $22,270 and $3,968, and the employee benefit deduction was derived by adding expenditures of $3,275, $1,314, $437, and $248.

(d) For 1990, the wage deduction was an aggregate amount of $29,054, and the employee benefit deduction was derived by adding expenditures of $3,797, $62, $109, and $30.

Our review of the record reveals the following:

(a) During the years at issue, petitioner employed one or more employees in her law office and maintained a payroll account through which she paid her employees' salaries and related withholdings.

(b) Petitioner did not introduce into evidence at trial all of her payroll records or her Forms W-2, Wage and Tax Statement, for the years at issue. Nevertheless, petitioner's testimony and other documents establish that petitioner paid salaries, employment taxes, and employee benefits during each of the years at issue.

(c) For 1987, petitioner documented expenses characterized as employee benefit expenses of $1,159.55 (Ex. 38-R, lines 174-183), six deposits into the payroll account on various dates in May, November, and December 1987 totaling $3,041.72 (Ex. 38-R, lines 816-821), and additional salary and daycare payments of $946.86 in August 1987 (Ex. 38-R, lines 1112-1117), the deductibility of which respondent has conceded.

(d) For 1988, petitioner documented salary payments of $15,766.34 (Ex. 39-R, lines 833-865), additional salary payments of $1,218.52 to Cynthia O. Ransom during May 1988 (Ex. 39-R, lines 1294-1297), and daycare expenses in April and May 1988 of $72 (Ex. 39-R, lines 1291-1293), the deductibility of which respondent has conceded.

(e) For 1989, petitioner documented salary payments of $22,288.21 (Ex. 40-R, lines 509-532) and daycare expenses of $1,591.80 paid for one of her employees (Ex. 40-R, lines 551-571), the deductibility of which respondent has conceded.

(f) For 1990, petitioner documented salary payments of $6,658.20 (Ex. 41-R, lines 98-116) and $18,707.32 (Ex. 41-R, lines 856-873), the deductibility of which respondent has conceded.

Although petitioner did not introduce all of her payroll records into evidence, we are convinced that her failure to do so was more likely than not the result of the sheer volume of documentation with which she was dealing at trial and the lack of attention paid by both petitioner and respondent to the actual Schedule C categories. Petitioner, however, credibly testified at trial that she paid salaries, a telephone allowance, life insurance, health insurance, school and summer childcare expenses, and automobile expenses (including car insurance, a gas allowance, and car payments) to or for the benefit of her employees during 1987, 1988, and part of 1989. We also note that the documented amounts if annualized would generate an annual figure consistent with, or larger than, the amounts claimed on petitioner's Schedules C for the years at issue. We shall apply the Cohan rule to uphold petitioner's wage and employee benefits deductions for each of the years at issue.

Petitioner paid wages and provided employee benefits in the amounts deducted in each of the years at issue as shown on the chart at page 79 of this opinion.

### m.  Car and Truck

For the years at issue, petitioner claimed deductions for car and truck expenses paid in connection with her law practice as follows:

| Year | Amount |
|------|--------|
| 1987 | $6,672 |
| 1988 | 8,807 |
| 1989 | 5,354 |
| 1990 | [1]10,399 |

[1]This amount includes car lease payments of $7,159 claimed as rent.

Mr. Aunan's workpapers reveal that the following items of car and truck expenses were taken into account in calculating the deductions for the years at issue:

| Year | Car lease | Repairs | Gas | Total |
|------|-----------|---------|-----|-------|
| 1987 | $3,634 | $1,647 | $76 | |
|      | 1,398 | 300 | 54 | $7,109 |
| 1988 | 6,228 | 631 | 2,689 | 9,548 |
| 1989 | 5,190 | | 519 | |
|      | | | 71 | |
|      | | | 3 | 5,783 |
| 1990 | 8,076 | 1,424 | 517 | |
|      | | 601 | 33 | |
|      | | 877 | | 11,528 |

Our review of the record reveals the following:

(a) During 1987, 1988, and 1989, petitioner leased two cars for business purposes--a 1988 Toyota Camry from Wilkens Toyota for general office use (driven by the process server, law clerk, courier, and petitioner) and a 1987 Toyota Tercel from GE Credit Auto Leasing for her secretary's use. Petitioner had another car for her personal use.

(b) During 1990, petitioner leased three cars for business purposes--a Toyota Tercel, a Toyota Camry, and a Hyundai that was leased in March 1990.

(c) For 1987, petitioner documented, and respondent concedes the deductibility of, car expenses of $2,426.15 (Ex. 38-R, lines 283-297), $5,099.07 (Ex. 38-R, lines 1005-1015), and $1,231 (Ex. 38-R, lines 809-812; SSR dated 9/10/99), for a total amount documented of $8,756.22.

(d) For 1988, petitioner documented, and respondent concedes the deductibility of, car expenses of $7,582.50 (Ex. 39-R, lines 355-382; SSR dated 9/10/99), $478.90 (Ex. 39-R, lines 577-595), and $439.82 (Ex. 39-R, lines 1744-1764; SSR dated 9/10/99), for a total amount documented of $8,501.22.

(e) For 1989, petitioner documented, and respondent concedes the deductibility of, car expenses of $4,409.13 (Ex. 40-R, lines 223-239; SSR dated 9/10/99), $1,236.30 (Ex. 40-R, lines 402-428), $748.78 (Ex. 40-R, lines 1533-1538, 1540-1559; SSR 9/10/99), and

$43.90 (Ex. 40-R, lines 1787-1790), for a total amount documented of $6,438.11.

(f) For 1990, petitioner documented, and respondent concedes the deductibility of, car expenses of $7,713.61 (Ex. 41-R, lines 1176-1222; SSR dated 9/10/99), and $245.44 (Ex. 41-R, lines 1483-1496), for a total amount documented of $7,959.05.

Petitioner paid car and truck expenses in connection with her law practice in each of the years at issue in the amounts summarized above and shown on the chart at page 79 of this opinion.

### n. Rent

For the years at issue, petitioner claimed deductions for rent in connection with her law practice as follows:

| Year | Amount |
| --- | --- |
| 1987 | $11,460 |
| 1988 | 10,256 |
| 1989 | 9,706 |
| 1990 | [1]6,175 |

[1]Total rent expense claimed ($13,334) reduced by car lease payments ($7,159) that were included as part of rent expense on petitioner's 1990 return.

Mr. Aunan's workpapers show totals only and do not contain any information identifying the rental expenses claimed.

Our review of the record reveals the following:

(1) During each of the years at issue, petitioner leased office space that she used for her law practice.

(2) During 1987, petitioner entered into a predevelopment purchase agreement for office space described as Suite 11, 1410 Energy Park Drive, that required her to pay $85,000 for the office once the development work was completed. For approximately 4 months before petitioner actually moved into Suite 11, she rented Suite 8 and used it as her temporary law office. Petitioner paid $955 per month to the Trah Partnership for 4 months (Ex. 38-R, lines 164-165, 1066-1067), and respondent has conceded that these amounts are deductible.

(3) In July 1987, petitioner moved into Suite 11 but did not close on the purchase agreement because she could not get the developer to schedule the closing. Petitioner maintained her law office in Suite 11 until 1990 when the developer's interest in the property, 1410 Energy Park Drive, was foreclosed.

(4) When petitioner first moved into Suite 11 in July 1987, she agreed to pay rent at the rate of $1,239.47 per month until the closing under the purchase agreement was held. Petitioner expected this arrangement to be of short duration. No closing, however, was ever scheduled. Sometime after she moved into Suite 11, petitioner ceased paying rent to the developer in an effort to force a closing under the purchase agreement. Petitioner was sued for unpaid rent and resolved the litigation by escrowing approximately $10,000 in 1990 to settle the claim. However, the

escrowed funds were not released, if at all, until sometime after 1990.

(5) Petitioner paid architect and designer fees with respect to Suite 11. Petitioner also paid for the improvements made to Suite 11.

(6) In October 1989, petitioner's law office was burglarized. The burglary caused damage to the doorway, but the developer refused to repair the damage. Petitioner made the necessary repairs.

(7) By the time petitioner's tax returns for the years at issue were prepared, the developer's interest in 1410 Energy Drive had been foreclosed. It is reasonable to assume, therefore, that all amounts paid with respect to Suite 11 during the years at issue, except for the development costs that were depreciated (Ex. 38-R, lines 222-228) and the interest on the business loan, were deducted by Mr. Aunan as rent. However, the record does not give us sufficient information to estimate the amount of rent or rent equivalent that petitioner paid during 1988-90.

We conclude that petitioner paid rent for her law office during 1987 in the amount of $3,820, as shown on the chart at page 79 of this opinion. We lack sufficient information to estimate petitioner's rent expense for 1988-90.

o.  Taxes

For the years at issue, petitioner claimed deductions for taxes as follows:

| Year | Amount |
|------|--------|
| 1987 | $1,235 |
| 1988 |  4,908 |
| 1989 |  5,051 |
| 1990 | 10,601 |

Mr. Aunan's workpapers, which describe the tax expense category as "P/R Taxes", reveal that the following entries comprised the deducted amounts:

(a) For 1987, amounts of $491 and $744, for a total amount deducted of $1,235;

(b) for 1988, amounts of $382 and $4,526, for a total amount deducted of $4,908;

(c) for 1989, a single amount of $2,799 is listed, but the final expense figure shown on Mr. Aunan's workpapers is $5,051, the total amount deducted on petitioner's return;

(d) for 1990, a total amount of $10,601.

Our review of the record reveals the following:

(a) For 1987, petitioner documented two payments to the IRS, in September and December 1987, and one payment to the Commission of Revenue, in September 1987, totaling $490.98 (Ex. 38-R, lines 803-805).  Respondent concedes the deductibility of these payments.

(b) For 1988, petitioner documented $5,113.77 of payments to the IRS ($4,034.98) and the Minnesota Department of Revenue ($850.90) and deposits into petitioner's payroll account ($227.89) covering the months of February, May, July, August, and October 1988 (Ex. 39-R, lines 652-664).  Of the amounts documented, petitioner concedes that $1,200.97 was deposited into the payroll account (and presumably was claimed as a wage deduction), and respondent concedes the deductibility of the payments to the Minnesota Department of Revenue.

(c) For 1989, petitioner documented $3,068.20 of payments to the IRS ($2,324.64) and to the Minnesota Department of Revenue, the Minnesota Department of Jobs, the Minnesota UC Fund, the Commissioner of Revenue, and the Employee Benefit Administration ($743.56) (Ex. 40-R, lines 257-266).  Respondent conceded the deductibility of all of these payments.

(d) For 1990, petitioner documented $11,253.01 of payments to the IRS ($9,888.44), the Department of Revenue ($1,167.19), and the Minnesota Department of Jobs ($197.38) (Ex. 41-R, lines 809-838) but provided no information regarding the nature or purpose of the payments.  Respondent has not conceded that any of these payments is deductible.

(e) During each of the years at issue, petitioner paid wages to employees and had an obligation to pay the employer's share of Federal Insurance Contributions Act (FICA) and Federal

Unemployment Tax Act (FUTA) taxes, see secs. 3111(a) and (b)(6),
3301, as well as the employer's share of State employment and
unemployment taxes.  Such taxes are deductible when paid in
carrying on the employer's trade or business.  Sec. 162(a).
Although we cannot precisely ascertain from the record the exact
amount of FICA and FUTA taxes paid by petitioner, we shall apply
the Cohan rule and allow deductions for the employer's share of
FICA and FUTA taxes, calculated on the wages that we have held
are deductible in each of the years at issue.  The following
rates were in effect with respect to FICA (old-age, survivors,
and disability insurance (sec. 3111(a)) and hospital insurance
(sec. 3111(b)(6))), and FUTA (sec. 3301) for each of the years at
issue:

| Year | FICA | | FUTA |
| | Old Age | Hospital | |
| --- | --- | --- | --- |
| 1987 | 5.7 percent | 1.45 percent | 6 percent |
| 1988 | 6.06 percent | 1.45 percent | 6.2 percent |
| 1989 | 6.06 percent | 1.45 percent | 6.2 percent |
| 1990 | 6.2 percent | 1.45 percent | 6.2 percent |

Applying these rates to the wages allowed as deductions in each
of the years at issue results in deductions for the employer's
share of FICA and FUTA tax of $1,839.82 for 1987, $2,632.74 for
1988, $3,597.23 for 1989,[19] and $4,023.98 for 1990.

---

[19]Respondent already has conceded that $2,324.64 of this
amount is deductible.  We have calculated the amount allowed as a
deduction for 1989 to eliminate any duplication.

Petitioner is entitled to deduct tax payments in each of the years at issue in the amounts conceded by respondent and allowed under the Cohan rule. The amounts are shown on the chart at page 79 of this opinion.

### p. Interest

For the years at issue, petitioner claimed deductions for interest paid in connection with her law practice as follows:

| Year | Amount |
|------|--------|
| 1987 | $10,034 |
| 1988 | 3,053 |
| 1989 | 2,926 |
| 1990 | 2,070 |

Mr. Aunan's workpapers include a workpaper labeled "Business Interest", which contains the following entries:

|  | 1987 | 1988 | 1989 | 1990 |
|---|------|------|------|------|
| Citibank MasterCard | $260.00 | $319.50 | $365.45 | $258.66 |
| Amex Gold |  |  |  |  |
| Citibank Visa | -- | 202.07 | 270.63 | 235.71 |
| Citibank Preferred | -- | -- | 232.16 | 581.82 |
| First Card | 365.93 | 790.58 | 910.97 | 870.01 |
| Amex Green |  | 1.47 | 17.04 | 81.37 |
| TCF Visa | -- | -- | 284.59 | -- |
|  | 625.93 | 1,313.62 | 2,080.84 | 2,027.57 |

The total amount of credit card interest in each year was then rounded and added to amounts characterized as "Capital Loan" to arrive at the total business interest deducted in each of the years at issue:

| Year | Credit Card | Capital Loan | Total |
|------|-------------|--------------|-------|
| 1987 | $626 | $9,408 | $10,034 |
| 1988 | 1,314 | 1,739 | 3,053 |
| 1989 | 2,081 | 845 | 2,926 |
| 1990 | 2,028 | 42 | 2,070 |

Our review of the record reveals the following:

(a) Petitioner maintained various credit card accounts that she used for business purposes during the years at issue.

(b) During each of the years at issue, petitioner paid interest expense attributable to her business use of her credit card accounts.

(c) Petitioner documented interest expense paid on her Citibank Visa account for 1988 of $202.07.

(d) Petitioner documented, and respondent concedes the deductibility of, interest expense paid on petitioner's Citibank MasterCard account for 1989 of $390.62 (Ex. 40-R, lines 1841, 1848, 1852).

(e) Petitioner documented the existence of a business loan with ANB, the purpose of which was to finance leasehold improvements.  The face amount of the loan was $19,342.33, and it carried an annual interest rate of 10.25 percent.

(f) Petitioner documented that she paid interest on the business loan in the following amounts:  1988--$1,738.71, 1989--$844.55, 1990--$42.44.

Although petitioner did not introduce all of her credit card records for each of the years at issue into evidence, we are

satisfied from the documentation that was introduced that petitioner maintained the credit card accounts in question and that she used them for her law practice. We are also satisfied that, at the time Mr. Aunan prepared petitioner's returns for the years at issue, he had documentation of the credit card interest paid by petitioner during the years at issue.

With respect to the capital loan interest deducted, petitioner produced copies of information returns that confirmed the interest expense paid with respect to petitioner's business loans for 1988, 1989, and 1990. The amounts documented corresponded exactly with the amounts shown on Mr. Aunan's workpapers. Although petitioner did not introduce into evidence copies of her interest statements for 1987, we believe that there is a sufficient factual predicate in the record to support a finding that petitioner incurred interest expense attributable to her business loans and credit card accounts as claimed on her 1987 Schedule C.

Petitioner paid interest expenses as claimed on her Schedules C for the years at issue and reflected on the chart at page 79 of this opinion.

### q. Travel

For the years at issue, petitioner claimed deductions for business travel as follows:

| Year | Amount |
|------|--------|
| 1987 | $1,039 |
| 1988 | -- |
| 1989 | 1,601 |
| 1990 | 1,988 |

Mr. Aunan's workpapers reveal that the following entries comprised the deducted amounts:

(a) For 1987, a cumulative amount of $1,039;

(b) for 1989, a cumulative amount of $1,601;

(c) for 1990, amounts of $12 and $1,976, for a total amount deducted of $1,988.

Mr. Aunan's workpapers also show a $9 entry for travel for 1988, but that amount was not deducted as travel on petitioner's 1988 Schedule C. Instead, it appears Mr. Aunan added the $9 item to Miscellaneous Expense and deducted it as such on petitioner's 1988 Schedule C.

Our review of the record reveals the following:

(a) For 1987, petitioner documented, and respondent concedes the deductibility of, business travel expenses of $520, $53.07, $104.74, $258, $10, $310, and $310, totaling $1,565.81 (Ex. 38-R, lines 1134, 1190-1191, 1193-1196).

(b) For 1988, petitioner documented, and respondent concedes the deductibility of, business travel expenses (including baggage and flight insurance) totaling $832.50 (Ex. 39-R, lines 1841-1843, 1878-1880).

(c) For 1989, petitioner documented, and respondent concedes the deductibility of, business travel expenses totaling $947 (Ex.40-R, lines 1849-1851).

(d) For 1990, petitioner documented, and respondent concedes the deductibility of, business travel expenses of $856.13 (Ex. 41-R, lines 1374-1385) and $463.59 (Ex. 41-R, lines 1661-1663), for a total of $1,319.72.

Petitioner paid business travel expenses during each of the years at issue in the amounts summarized above and reflected in the chart at page 79 of this opinion.

### r.  Advertising and Meals & Entertainment

For the years at issue, petitioner claimed deductions for advertising and for meals and entertainment in connection with her law practice as follows:

| Year | Advertising | Meals & ent. | Total |
|------|-------------|--------------|-------|
| 1987 | $98 | $896 | $994 |
| 1988 | 160 | 1,961 | 2,121 |
| 1989 | 513 | 795 | 1,308 |
| 1990 | 2,384 | 3,286 | 5,670 |

Mr. Aunan's workpapers reveal that the following entries comprised the deducted amounts:

(a) For "Promotion & Advertising", cumulative amounts of $98, $160, and $513 for 1987, 1988, and 1989, respectively, and amounts of $1,253 and $1,131, for a total amount deducted of $2,384 for 1990;

(b) for entertainment, amounts of $951 and $169, totaling $1,120 for 1987; amounts of $2,093, $316, and $42, totaling $2,451 for 1988; amounts of $472 and 522, totaling $994 for 1989; and amounts of $1,844, $478, $269, and $1,516, totaling $4,107 for 1990 before application of the section 274(n) limitation.

Our review of the record reveals the following:

(a)  Petitioner maintained voluminous records to document her practice of entertaining, and purchasing gifts for, clients, employees, referral sources, judges, and other members of the legal community throughout the years at issue.

(b) In his notices of deficiency, respondent did not assert section 274 as a ground for disallowing any of petitioner's deductions for business promotion/advertising or for meals and entertainment.  Respondent only asserted a section 162 standard as the basis for his proposed disallowance of petitioner's deductions.

(c) Petitioner testified extensively at trial regarding the identity of the person who was entertained or to whom a gift was given, as well as the business purpose of many of the individual items comprising her business promotion and meals and entertainment expenses.  The date and amount of the expenditures were documented by invoices, canceled checks, credit card and other receipts, and other records.  In some cases, receipts

retained by petitioner as part of her business records were no longer legible.

(d) For 1987, petitioner presented documentation of the following expenditures that were listed on Exhibit 38-R in the following categories:[20]

| Category | Line Nos. | Amount |
|---|---|---|
| Bachman's (bus. gifts) | 64-70 | $118.96 |
| Client entertainment | 485-521 | 971.63 |
| Credit cards | 1171, 1173, 1175, 1181-1189, 1192, 1197-1232 | 1,496.72 |

(e) For 1988, petitioner presented documentation of the following expenditures that were listed on Exhibit 39-R in the following categories:

| Category | Line Nos. | Amount |
|---|---|---|
| Client & employee gifts & entertainment | 1183-1297 | $8,126.48 |
| Client gifts | 1593-1608 | 139.46 |
| Employee benefits | 1612-1637 | 195.49 |
| Office party | 1641-1643 | 131.66 |
| Client entertainment | 1677-1740 | 935.18 |

Of the expense items listed on lines 1183-1297, respondent conceded that $2,266.55 was deductible, and the nature of the expenses indicates that they were not entertainment expenses. During trial, petitioner conceded that some of the items were not

_____

[20]Petitioner "conceded" several of the smaller expense items; i.e., she did not offer any additional evidence regarding them, because she was interested in getting to the "large items". She did not concede that the items were not deductible, however, and she did document the date and amount of the expense and the identity of the payee as reflected on Exhibits 38-R through 41-R.

deductible and testified that other items were misclassified but, nevertheless, were deductible business expenses.

(f) For 1989, petitioner presented documentation of the following expenditures that were listed on Exhibit 40-R in the following categories:

| Category | Line Nos. | Amount |
|----------|-----------|--------|
| Client gifts | 148-162 | $465.13 |
| Employee & client gifts & entertainment | 950-1076 | 3,365.06 |
| Client gifts | 1469-1481 | 178.62 |
| Client entertainment | 1485-1529 | 747.61 |
| American Express | [1]1796-1835 | 1,118.95 |

[1]Some of these items, which do not appear to be meal or entertainment expenses, have been conceded by respondent. The amount shown has been reduced by the conceded amounts.

(g) For 1990, petitioner presented documentation of the following expenditures that were listed on Exhibit 41-R in the following categories:

| Category | Line Nos. | Amount |
|----------|-----------|--------|
| Business promotion | 151-166 | $1,252.94 |
| Client gifts | 193-206 | 534.09 |
| Employee gifts | 877-883 | 543.37 |
| Client entertainment | 887-964 | 1,909.23 |
| Business promotion | 1303-1306 | 429.31 |
| Client entertainment | 1439-1478 | 1,074.75 |
| Client gifts | 1579-1593 | 484.17 |

After reviewing petitioner's documentation and testimony, we have no doubt that a properly conducted audit of petitioner's meals and entertainment and business promotion records could have resulted in a reasonable dispute regarding whether the requirements of section 162 have been satisfied with respect to

each expense item and, if so, whether section 274 should operate to preclude deductions for some of the items.  We also have no doubt, however, that petitioner had deductible meals and entertainment expenses and purchased deductible business gifts for clients, referral sources, and other professional people in each of the years at issue.  We also note that the documentation presented by petitioner that was reviewed and summarized by respondent in Exhibits 38-R through 41-R substantially exceeds the deductions claimed by petitioner for advertising (business promotion) and meals and entertainment in each of the years at issue:

| Year | Total on return | Total on exhibits |
|------|-----------------|-------------------|
| 1987 | $994 | $2,587.31 |
| 1988 | 2,121 | 9,528.27 |
| 1989 | 1,308 | 5,875.37 |
| 1990 | 5,670 | 6,227.86 |

Recognizing the flaws in each party's position, we conclude only that petitioner paid advertising/business promotion and meals and entertainment expenses in sufficient amounts to support the deductions claimed in each of the years at issue.

### s. Miscellaneous

For the years at issue, petitioner claimed deductions for miscellaneous business expenses as follows:

| Year | Amount |
|------|--------|
| 1987 | $355 |
| 1988 | 6,424 |
| 1989 | 3,343 |
| 1990 | 2,427 |

Mr. Aunan's workpapers reveal that the following entries comprised the deducted amounts:

(a) For 1987, parking expenses of $35 and miscellaneous expenses of $320, for a total deducted of $355;

(b) for 1988, travel expenses of $9 and miscellaneous expenses of $6,415, for a total deducted of $6,424;

(c) for 1989, miscellaneous expenses of $2,878 and $465, for a total deducted of $3,343;

(d) for 1990, miscellaneous expenses of $2,398 and parking expenses of $29, for a total deducted of $2,427.

Our review of the record reveals the following:

(a) During 1987, petitioner paid the following Schedule C expenses that have not been previously allocated in this analysis to any other Schedule C category:

| Category | Ex./line Nos. | Amount | Conceded by respondent? |
|----------|---------------|--------|--------------------------|
| Various | 38-R/33-35 | $223.76 | Yes |
| Parking | 38-R/118-120 | 13.25 | Yes |
| Various | 38-R/130-133 | 371.25 | Yes |
| Various | 38-R/266-267 | 12.25 | Yes |
| Various | 38-R/277-279 | 22.00 | Yes |
| Various | 38-R/742-743 | 142.68 | Yes |
| Various | 38-R/758-762 | 357.23 | Yes |
| Various | 38-R/781-786 | 250.61 | Yes |
| Various | 38-R/860 | 30.00 | Yes |
| Various | 38-R/904-917 | 1,131.68 | Yes |
| Various | 38-R/936 | 581.00 | Yes |
| Various | 38-R/958-965, 998-999, 1004 | 932.96 | Yes |
| Various | 38-R/1037 | 7.00 | Yes |
| Various | 38-R/1042-1044, 1046-1050, 1053-1055 | 1,326.08 | Yes |
| Various | 38-R/1059 | 17.23 | Yes |
| Various | 38-R/1071-1075 | 165.39 | Yes |
| Various | 38-R/1087 | 37.00 | Yes |
| Various | 38-R/1091 | 300.00 | Yes |
| Various | 38-R/1098-1108 1110 | 686.10 | Yes |
| Various | 38-R/1142 | 97.85 | Yes |
| Various | 38-R/1152 | 15.00 | Yes |
| | | 6,720.32 | |

(b) During 1988, petitioner paid the following Schedule C expenses that have not been previously allocated in this analysis to any other Schedule C category:

| Category | Ex./line Nos. | Amount | Conceded by respondent? |
|----------|---------------|--------|-------------------------|
| Various | 39-R/4-21 | $1,052.20 | Yes |
| Luth. Broth. | 39-R/128-130, 133-134 | 274.62 | No |
| CLE Book | 39-R/138 | 40.00 | No |
| Various | 39-R/139 | 32.33 | Yes |
| Various | 39-R/151-193 (including 165) | 1,034.18 | Yes No |
| Misc. supp. | 39-R/200,203, 206, 209-212 | 432.82 | No |
| Misc. supp. | 39-R/214-222, 226 | [1]222.17 | No |
| Various | 39-R/239-240 | 110.50 | No |
| Various | 39-R/534-538 | 81.25 | Yes |
| Client exp. | 39-R/1132-1134 | 5,111.56 | No |
| Various | 39-R/1437-1567 | 535.22 | Yes |
| Various | 39-R/1787,1791, 1802-1803, 1805, 1810, 1812, 1815-1816 | 333.58 | Yes |
| Various | 39-R/1826-1828, 1830-1832 | 290.82 | Yes |
| Various | 39-R/1839-1840, 1845-1846, 1849-1855, 1857-1858 | 151.77 | Yes |
| Various | 39-R/1864,1870, 1876-1877, 1881 | 165.37 | Yes |
| | | 9,868.39 | |

[1]The amount allowed with regard to these items is based on petitioner's testimony at trial, which we find credible.

(c) During 1989, petitioner paid the following Schedule C expenses that have not been previously allocated in this analysis to any other Schedule C category:

| Category | Ex./line Nos. | Amount | Conceded by Respondent? |
|----------|---------------|--------|-------------------------|
| Off. supp. | 40-R/13 | $34.75 | No |
| Off. supp. | 40-R/15 | 19.46 | No |
| Off. supp. | 40-R/16 | 151.04 | No |
| Off. supp. | 40-R/21-24 | 74.51 | No |
| Off. supp. | 40-R/29-30 | 14.51 | No |
| Off. supp. | 40-R/40 | 5.25 | No |
| Off. supp. | 40-R/47 | 24.85 | No |
| Off. supp. | 40-R/58-60 | 160.64 | No |
| Client exp. | 40-R/209-210 | 16.70 | Yes |
| Client exp. | 40-R/547 | 4,000.00 | No |
| Client exp. | 40-R/805 | 17.00 | Yes |
| Client exp. | 40-R/826 | 2.00 | No |
| Client exp. | 40-R/1181, 1182 | 1,020.47 | No |
| Auto | 40-R/1533-1536 | 38.26 | Yes |
| Parking | 40-R/1568-1662 | 340.31 | Yes |
| Off. supp. | 40-R/1682 | 142.18 | No |
| Off. supp. | 40-R/1778 | 24.80 | No |
| Off. supp. | 40-R/1779-1780 | 269.25 | Yes |
| Auto | 40-R/1816-1817 | 261.82 | Yes |
| Various | 40-R/1831-1833 | 237.62 | Yes |
| Off. subs. | 40-R/1835 | 24.00 | No |
| Various | 40-R/1842, 1847, 1854-1856, 1858-1860 | 330.96 | Yes |
| | | 7,210.38 | |

(d) During 1990, petitioner paid the following Schedule C expenses that have not been previously allocated in this analysis to any other Schedule C category:

| Category | Ex./line Nos. | Amount | Conceded by Respondent? |
|---|---|---|---|
| Miscell. | 41-R/265, 269, 270, 278, 286, 290, 307 | $730.49 | No |
| Off. furn. | 41-R/311-319, 321-325 | 782.75 | No |
| Parking | 41-R/419-424 | 28.50 | Yes |
| Admin. fees | 41-R/528-529 | 20.00 | Yes |
| Court rpt. | 41-R/533-534 | 192.52 | Yes |
| Fees to attys. | 41-R/549 | 9,051.55 (out of $15,000) | No |
| Client fees | 41-R/654-655, 657-659 | 255.47 | Yes |
| Client fees | 41-R/656, 661 | 1,640.90 | No |
| Emp. benef. | 41-R/682-686, 693-699 | 842.37 | No |
| Rental exp. | 41-R/703-712 | 2,304.35 | Yes |
| Bus. prom. | 41-R/1303-1304, 1306 | 364.40 | Yes |
| Prof. fee | 41-R/1368 | 25.00 | Yes |
| Client fee | 41-R/1390 | 1.62 | Yes |
| Parking | 41-R/1501-1503, 1505-1524, 1530-1574 | 241.30 | Yes |
| Auto | 41-R/1682-1683 | 23.50 | Yes |
| | | 16,504.72 | |

t. Reconciliation

A comparison of the Schedule C expenses allowed pursuant to the foregoing analysis with the Schedule C expenses claimed on petitioner's Federal income tax returns for the years at issue reveals the following:

| | 1987 | | 1988 | | 1989 | | 1990 | |
|---|---|---|---|---|---|---|---|---|
| | Per Return | Per Opinion | Per Return | Per Opinion | Per Return | Per Opinion | Per Return | Per Opinion |
| Advertising | $98 | $98.00 | $160 | $160.00 | $513 | $513.00 | $2,384 | $2,384.00 |
| Bank charges | 469 | 682.00 | 1,035 | 1,035.00 | 120 | 120.00 | 120 | 120.00 |
| Car & truck | 6,672 | 8,756.22 | 8,807 | 8,501.22 | 5,354 | 6,438.11 | 3,240 | 7,959.05 |
| Depreciation | 2,546 | 2,546.00 | 11,974 | 11,974.00 | 2,444 | 2,444.00 | 1,467 | 1,467.00 |
| Dues & pubs. | 2,337 | 4,471.04 | 3,867 | 4,038.56 | 2,675 | 2,653.00 | 4,095 | 2,311.97 |
| Employee ben. | 2,057 | 2,057.00 | 2,243 | 2,243.00 | 5,274 | 5,274.00 | 3,998 | 3,998.00 |
| Insurance | 514 | 1,320.76 | 3,677 | 3,559.69 | 3,745 | 3,865.31 | 3,565 | 3,365.81 |
| Interest | 10,034 | 10,034.00 | 3,053 | 3,053.00 | 2,926 | 2,926.00 | 2,070 | 2,070.00 |
| Legal & prof. | 5,104 | 5,104.22 | 7,239 | 9,423.18 | 6,128 | 6,140.18 | 13,536 | 13,533.59 |
| Rent | 11,460 | 3,820.00 | 10,256 | --- | 9,706 | --- | 13,334 | --- |
| Supplies | 4,174 | 4,209.77 | 12,297 | 9,414.68 | 13,139 | 10,785.45 | 7,263 | 11,421.26 |
| Taxes | 1,235 | 2,330.80 | 4,908 | 3,483.64 | 5,051 | 4,340.79 | 10,601 | 4,023.98 |
| Travel | 1,039 | 1,565.81 | --- | 832.50 | 1,601 | 947.00 | 1,988 | 1,319.72 |
| Meals & ent. | 896 | 896.00 | 1,961 | 1,961.00 | 795 | 795.00 | 3,286 | 3,286.00 |
| Utilities | 838 | 2,324.85 | 3,784 | 4,075.33 | 6,152 | 6,046.48 | 3,515 | 3,246.27 |
| Wages | 13,991 | 13,991.00 | 19,203 | 19,203.00 | 26,238 | 26,238.00 | 29,054 | 29,054.00 |
| Moving exps. | 3,258 | 3,258.07 | --- | --- | --- | --- | --- | --- |
| Process serv. | 2,482 | 2,541.70 | 2,495 | 2,373.28 | 915 | 570.70 | 1,822 | 1,909.16 |
| Contract serv. | 4,637 | 4,637.77 | 10,618 | 10,759.31 | 9,617 | 9,748.39 | 10,079 | 10,079.24 |
| Court fees | 2,002 | 2,692.65 | 7,458 | 4,553.63 | 9,104 | 8,271.41 | 6,699 | 6,910.02 |
| Collect. fees | --- | --- | --- | --- | 850 | --- | --- | --- |
| Miscellaneous | 355 | 6,720.32 | 6,424 | 9,868.39 | 3,343 | 7,210.38 | 2,427 | 16,504.72 |
| | 76,198 | 84,057.98 | 121,459 | 110,512.41 | 115,690 | 105,327.20 | 124,543 | 124,963.79 |

The chart summarizes the Schedule C expenses that we have concluded, based on a preponderance of the evidence, petitioner is entitled to deduct in each of the years at issue. As reflected in the chart, petitioner has substantiated Schedule C expenses for each of the years 1987 and 1990 in excess of those claimed on her tax returns for those years. The chart also

reveals that, for 1988 and 1989, petitioner has substantiated Schedule C expenses in amounts that are less than the amounts claimed on her tax return for each year.

The chart also illustrates what should be obvious by now-- respondent's determination disallowing her Schedule C expenses for the years at issue was arbitrary and unreasonable. We cannot explain how the audit process malfunctioned so badly, but it is readily apparent that the malfunction occurred. The disallowance of petitioner's business expenses after petitioner had produced auditable business records for considered review by the revenue agent and others has resulted in significant expenditures of time on the part of petitioner, respondent's counsel, and this Court to conduct what was, in effect, an audit. This case has amply demonstrated that the litigation process is not well suited for the exchange of information that should occur in a properly conducted audit.

D.  Net Operating Losses

Unlike the record made by petitioner with respect to her Schedule C income and deductions, the record made by petitioner with respect to her NOL carryforward deductions does not establish that respondent's determinations disallowing petitioner's NOL carryforward deductions were erroneous. Although petitioner alluded to the fact that respondent did not examine the NOLs during his examination of the years at issue,

petitioner did not clearly testify that she produced to the revenue agent the records necessary to support the NOL carryover deductions claimed for the return years at issue. More importantly, although petitioner introduced some documentation at trial with respect to her claimed NOL deductions, the documentation was insufficient to support a finding that she is entitled to all or any portion of such carryforwards.

The principal problem with the trial record is that the documentation, although substantial, is incomplete in many respects. For example, petitioner introduced no records for 1977 or 1984-86 and insufficient records for 1980 and 1982, the years in which petitioner claimed net operating losses, to enable us to verify the losses or to show how the losses were absorbed in other years.

Under the foregoing circumstances, we hold that petitioner has failed to prove she is entitled to any portion of the reported 1980-86 NOL carryforward.

II. Additions to Tax and Penalties

A. Section 6651(a)(1) Addition to Tax

Section 6651(a)(1) imposes a penalty equal to 5 percent of the tax due for each month of delayed filing beyond the due date (including extensions) up to a maximum of 25 percent "unless it is shown that such failure [to file] is due to reasonable cause and not due to willful neglect".

Petitioner was well aware that her 1987 return and the 1988-90 joint returns with her husband were not filed timely. All four returns were filed between August 25, and August 27, 1992, well after the due dates, including the extended due date for 1987. For 1988-90, petitioner did not furnish the accountant with information he needed to prepare the returns until after the return due dates.

Although petitioner testified that the late filings were largely attributable to her husband's failure to gather his tax information and pay his self-employment tax and/or to the accountant's delay in completing the returns, she failed to pursue available alternatives such as insisting on the timely filing of her 1987 return, timely filing a "married filing separate return" for 1988-90, or demanding that her husband and his accountant complete and file the joint returns for 1988-90 by their due dates using the best information available (and, if necessary, filing amended returns when the rest of the information became available). Petitioner's failure to ensure that her returns were filed timely under these circumstances supports the imposition of the delinquency addition to tax. See Estate of Thomas v. Commissioner, T.C. Memo. 2001-225. Consequently, we sustain respondent's imposition of the section 6651(a)(1) delinquency addition to tax for each of the years at issue, recomputed in accordance with this opinion.

B.  Negligence Addition to Tax Under Section 6653

Section 6653(a), applicable to petitioner's 1987 and 1988 taxable years, authorizes the imposition of an addition to tax for negligence.  It provides that, if any part of any underpayment is due to negligence or disregard of rules or regulations, an addition equal to the sum of 5 percent of the underpayment and, for 1987, an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment attributable to negligence for the period from the underpayment due date to the assessment date (or if earlier, the tax payment date) shall be added to the tax.  For purposes of section 6653(a), negligence is defined to include "any failure to make a reasonable attempt to comply with the provisions of this title", and disregard is defined to include "any careless, reckless, or intentional disregard."  Sec. 6653(a)(3).

Respondent contends that petitioner is liable for the section 6653(a) addition to tax for negligence "because she failed to use reasonable care in ascertaining and reporting her tax liabilities" for 1987 and 1988.  Specifically, respondent argues that petitioner is liable for the addition to tax because she "failed to keep adequate accounting records and claimed a large NOL deduction with little or no support."  Respondent does not argue, however, that petitioner's failure to file timely

returns is a basis for imposing the addition to tax under section 6653(a).

It is well established that a taxpayer's failure to keep records is a basis for imposing the addition to tax under section 6653(a).  See, e.g., Taylor v. Commissioner, T.C. Memo. 1988-389, affd. without published opinion 887 F.2d 259 (lst Cir. 1989).  As numerous cases have illustrated, however, the IRS and taxpayers can often differ regarding what constitutes a failure to keep records sufficient to support liability under section 6653(a).  Section 1.6001-1, Income Tax Regs., provides:

> any person subject to tax under subtitle A of the Code (including a qualified State individual income tax which is treated pursuant to section 6361(a) as if it were imposed by chapter 1 of subtitle A), or any person required to file a return of information with respect to income, shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information.

Respondent contends that the cited regulation required petitioner to maintain "adequate accounting records".  He supports his argument by focusing primarily on one exhibit introduced into evidence by petitioner and generally disparaging petitioner's records.  Although petitioner chose not to file a posttrial brief, she adamantly asserted at trial that she maintained voluminous records and that, while the records were not formal or perfect, they were routinely maintained in an organized form, were produced to the accountant who prepared her returns for the

years at issue, and adequately documented the income and expenses from her law practice.

Our review of the evidentiary record, when filtered through the parties' arguments, convinces us that petitioner should not be held liable for the addition to tax under section 6653(a) based on respondent's contention that she failed to keep adequate records. As we have stated previously, we found petitioner's testimony, including her testimony regarding her record keeping and her production of records during the audit, to be credible. In addition, the documents petitioner produced at trial amply demonstrated that she maintained records and that the records were auditable. Moreover, we accept petitioner's testimony that she produced those records for examination by respondent's revenue agent and Appeals officer on several different occasions over a period of several years. We are left with the impression that any gaps in petitioner's records at trial were more likely than not the result of the passage of time, the multiple and delayed reviews of petitioner's records by respondent and others, and petitioner's difficult personal circumstances before and during trial.

Respondent contends that petitioner's record keeping was inadequate, and therefore negligent, because she failed to maintain formal books of account as required by section 1.6001-1, Income Tax Regs., she failed to employ "competent help" to

prepare her tax returns, and she failed to furnish that help with the "necessary information" to file proper and timely returns. Respondent in his brief states: "It is evident petitioner failed to do so because she was unable to adequately reconstruct her expenses". We disagree. It simply does not follow from petitioner's failure to reconstruct completely her Schedule C expenses at trial that she failed to maintain adequate records or that she failed to hire competent help as respondent suggests.

Petitioner conceded at trial that she did not maintain formal books of account such as a general ledger or a cash receipts and disbursements journal. However, petitioner maintained voluminous records of her income and expenses, as she amply demonstrated at trial. We are convinced that the evidentiary gaps in the record, including the lack of documentation regarding petitioner's NOL carryforwards, are not the result of negligent record keeping, as respondent alleges, but are due to petitioner's financial and personal difficulties that arose following the years at issue. For example, petitioner testified that she had other records such as client and bank records, which would have enabled her to fill the evidentiary gaps, but she simply did not have the financial and personal resources to retrieve the records from storage and analyze those records under the circumstances. We have no doubt, however, that such records exist.

We hold that petitioner is not liable for the addition to tax under section 6653(a) for any of the years at issue.

C. Accuracy-Related Penalty Under Section 6662

Section 6662, applicable to petitioner's 1989 and 1990 years, authorizes the imposition of a 20-percent penalty for specified types of misconduct, including negligence or disregard of rules or regulations. Sec. 6662(a) and (b). Section 6662(c) adopts the same definitions of "negligence" and "disregard" as those utilized in section 6653 before its repeal.

Respondent contends that petitioner is liable for the accuracy-related penalty for 1989 and 1990 due to her alleged negligent record keeping and makes the same arguments with respect to section 6662 that he made with respect to section 6653. Consequently, we incorporate by reference our discussion of respondent's arguments under section 6653,[21] and we hold that petitioner did not negligently fail to maintain required records, as respondent contends.

---

[21]Neither party raised or addressed the issue of whether both the addition to tax under sec. 6651 and the accuracy-related penalty may be applied to the underpayment for a taxable year in which the taxpayer failed to file a timely return. Consequently, we do not discuss the issue even though it may provide an alternative ground for decision.

III. <u>Conclusion</u>

We have analyzed all of the testimony, exhibits, and stipulations in this unwieldy record in an effort to fairly and justly decide the issues presented by this case. The task has not been easy due largely to respondent's failure to examine petitioner's documentation before issuing the notices of deficiency in this case and respondent's blanket disallowance of all of petitioner's Schedule C expenses for 3 of the 4 years at issue. As petitioner conceded more than once at trial, however, petitioner must also take some responsibility for the gaps in the record presented to this Court. By failing to maintain formal books of account to summarize and organize her voluminous documentation, petitioner left herself exposed to the problems presented by this case and must accept a less than perfect result.

We have considered all of the arguments expressly or inferentially raised in this case by either party, and, to the extent not discussed, we find them to be irrelevant or without merit.

In light of the foregoing and to reflect concessions made by the parties,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>